STATE OF CONNECTICUT *v.* THOMAS ATWOOD

| SUPERIOR COURT | JUDICIAL DISTRICT OF WATERBURY | FILE NO. 496072 |
| --- | --- | --- |

Memorandum filed April 10, 1984

*Peter D. Markle,* assistant state's attorney, for the state.

*Frederick P. Devine, Jr.,* for the defendant.

DeMAYO, J. On September 26, 1982, at about 5:30 p.m., police officers of the town of Naugatuck responded to a "domestic complaint" at 39 School Street. At that address, the investigating officers opened a closet door and found a white male, later identified as the defendant, lying on top of a white female.

The defendant had a bloodstained kitchen knife in his left hand and stab wounds in his chest. His wrists were cut and he was rushed to a hospital. The female, who was dead from knife wounds and/or strangulation, was identified as the defendant's wife, Mary Atwood. The defendant was subsequently charged with murder, giving rise to these proceedings.

In the defendant's motion here "for use of testimony based on a hypnotic interview," he alleged that he had "neither a present memory nor a memory at any time in the past of the immediately preceding events surrounding the death of Mary Atwood." Claiming that this disability precludes meaningful participation in his defense and deprives him of "his right to effective assistance of counsel," the defendant moves that the court issue a pretrial ruling on the admissibility of his testimony should he decide to testify after undergoing hypnotism or a sodium amytal interview designed to refresh his memory. Over the state's objection, the court decided to hear this motion and issue a decision in limine for these reasons: Should the matter be postponed to the time of trial and a court then decide the issue in favor of the defense, a delay would then be required while interviews were scheduled with the proposed examiner, a very busy practitioner. Further, it is likely that the court hearing the case would follow the procedures of some of the states which admit testimony obtained by means of hypnosis or narcoanalysis. In attempting to achieve reliability and to avoid contamination of the subject by suggestibility, those courts have prepared and imposed strict conditions on the interview process. Since those guidelines are usually quite detailed, this too would consume considerable time and would delay the trial.

Postponement of the hearing and disposition of this motion until trial would place the defense in an untenable position. As the time for trial approached, defense

counsel would not know if his client's memory could be refreshed; if it were, he would not know if he were free to use the refreshed recollection. In effect, he would be starting trial without knowing if the defendant was even *available* as a witness.

The court heard this motion over all or part of seven nonconsecutive days which produced over 450 pages of testimony, much of it of a technical nature. Numerous chamber conferences were also necessary and, after oral argument, briefs were filed.

The defendant's motion alleges his inability to recall the events occurring immediately prior to the arrival of the police and bases his motion on his loss of memory, asserting that extraordinary[1] measures are required to enable him to assist in his defense and to enjoy effective assistance of counsel. In his brief, however, the defendant argues that the presence or absence of amnesia is of no consequence and that a defendant may be hypnotized and have his testimony admitted because a defendant cannot be denied the right to testify in his own behalf. He also argues that the state's concerns about the reliability of the process can be addressed by safeguards employed by those administering the interview. He also claims that the trier should weigh the value of this induced testimony but that all such testimony is admissible.

The state argues that the methods proposed by the defendant to retrieve memory are not reliable, and have not received general acceptance in the scientific community. It is also the state's contention that in order

[1] It should be noted that the motion concerns testimony elicited by hypnotism or sodium amytal (narcoanalysis). In the course of the hearing, the emphasis was placed on hypnotism and much of the expert testimony was addressed to that technique only. Nevertheless, the court has considered them both and this decision is directed toward both styles of memory retrieval.

for the court to grant this motion, it must first find that the defendant is suffering from amnesia, and that the defense has not proved this to be so.

After the defendant testified as to his inability to recall the events immediately prior to his wife's death and his own hospitalization with allegedly self-inflicted wounds, the defense called Howard Zonana, a psychiatrist and a practitioner of hypnotism. Zonana discussed hypnotism at length and characterized it as an "investigatory tool with risks," and one best used when confirmatory data are available. He further stated that hypnotism does not guarantee truthfulness or accuracy, and that the subject is susceptible to suggestion. He agreed that the defendant in a criminal case would have motivation to "confabulate" under hypnosis. (Confabulation is the addition to incomplete memory of suggestions, self-created fantasy, and later acquired information.)

The defense then called Robert A. Novelly, a psychologist, who gave his opinion that the defendant was suffering from amnesia. He based that opinion on the defendant's history and personality, on his lack of a brain disorder, on the fact that he retains fragments of memory, and on his loss of blood. From this loss of blood and from a reading of the hospital record, the witness concluded that the defendant's brain was deprived of oxygen, a common cause of amnesia. Novelly, however, never spoke to the defendant's treating physician. While agreeing that there are risks of contamination, suggestibility, and unreliability in the proposed techniques, Novelly felt that those risks could be minimized by careful attention to the procedures utilized.

Novelly conceded, however, that the use of hypnotism and sodium amytal to recover memory has not received general acceptance in the scientific community. When asked if he would rethink his opinion that the defend-

ant was amnesiac if he were to be told that there had been no oxygen loss to the brain, Novelly said he felt he would.

The state presented three witnesses, including Detective Dennis Clisham, who interviewed the defendant at the hospital where he was being treated for his allegedly self-inflicted wounds. This interview occurred two days after the wounded defendant and his deceased wife were discovered by the police. In his oral statement, the defendant is alleged to have recited details of the events preceding his wife's death, most of which he did not relate to Novelly. Nor were these details related by the defendant when he testified at this hearing.

Susan Teczar, an attending nurse, in addition to testifying about the visit of Detective Clisham, described the defendant's condition while he was in her care. She stated that medically he was fine and that, although he was periodically receiving a pain killer, he was cooperative, could talk, was conscious, and could follow instructions.

The testimony of Thomas H. Lyons, the defendant's attending physician, is of particular significance. Lyons gave permission for the defendant to be interviewed by the police on September 28, two days after the episode in question. He indicated he would have given that permission on September 27 as well since the defendant was stable and there was no medical reason to deny permission. He also stated that the defendant was able to converse at all times and that constant monitoring of his condition did not indicate a loss of the supply of oxygen to his brain. He was never put on a respirator and was never in need of oxygen.

The defendant's motion claims that the unusual techniques of hypnotism or a sodium amytal induced interview are necessary because the defendant has lost his

ability to recall the events preceding and surrounding his wife's death and his own hospitalization. A reading of the transcript of the defense presentation in support of the motion indicates that the purpose of the testimony offered was, to a great extent, to support the allegation that the defendant was suffering from amnesia. In fact, counsel, in calling the defendant to the stand, outlined the limited purpose of his testimony —to state that he had no recall of the events leading up to his hospitalization. The bulk of Novelly's detailed testimony dealt with amnesia and included his opinion that the defendant was amnesiac. Since the defendant in his brief now asserts a general right to testify after hypnosis whether he is suffering from amnesia or not, the court will address this claim as well as the original one based on the alleged amnesia.

The defendant's claim that he is suffering the effects of amnesia was rebutted by the state's offer of testimony which introduced statements the defendant allegedly made to the police and to his father. The contents of those statements were not included in his interview with Novelly nor in his court testimony. Those statements would indicate that the defendant, at least on September 28, two days after the incident, was able to remember and relate what occurred on September 26.

Of significance on the issue of the defendant's amnesia is the testimony of Novelly, who placed great emphasis on the hospital record, from which he presumed that, as a result of the defendant's self-inflicted wounds and his blood loss, the accompanying speedup of pulse was indicative of a reduction in the supply of blood to his brain.

The treating physician, Lyons, stated, however, that the defendant, his patient, had never suffered a loss

of oxygen. When told of this fact, Novelly indicated that he would reconsider his opinion that amnesia had occurred in the defendant.

On the basis of this evidence, the court must conclude that the defense did not meet the burden of proof on its allegation that the defendant was suffering from amnesia.

Although the finding above could be construed as conclusive of the issue presented by the defendant's motion, the facts and circumstances of this case warrant a consideration of the basic question of whether hypnotically or chemically induced testimony should be admitted into evidence, for the defendant's alternative theory, first raised in his brief, that a defendant has a right to testify after hypnosis or narcoanalysis irrespective of the existence of amnesia must be addressed.

Also, the issue might have to be dealt with again should the defense attempt to rectify the shortcomings of its presentation on the issue of amnesia. Testimony elicited from the defense witnesses in the course of this hearing echoes concerns expressed by other experts in the field of hypnotism and related techniques.

Zonana characterized hypnotism as an "investigative tool with risks," most useful when there is independent corroboration of the elicited data. In the present case, there is no possible corroboration—only the Atwoods were present. Both Zonana and Novelly conceded that there are risks of unreliability in both hypnotism and narcoanalysis in that the subject is apt to be influenced by the interviewer. Such a subject is also apt to repeat what he has decided he should adopt as his own testimony or what will please the interviewer. Zonana stressed that hypnotism is not guaranteed to elicit truth and that suggestibility is a risk. Novelly testified that sodium amytal is probably a more valid vehicle of recall

because the subject is rendered unconscious. Malingering is always a possibility in hypnotism and there is no absolute method to prevent "faking" of the hypnotic state.

Basically, these two defense experts agreed that neither method of memory retrieval had achieved general acceptance in the scientific community. Novelly feels the process can achieve reliability by careful monitoring at every step. In effect, both defense experts repeated the concerns expressed by those courts which have decided to exclude such artificially induced testimony.

Connecticut courts have not yet directly addressed the admissibility issue where the product offered has been drug or hypnotically induced.

In *State* v. *Nims,* 180 Conn. 589, 430 A.2d 1306 (1980), our Supreme Court upheld a trial court's action in admitting a tape recorded examination of a state's witness under hypnosis. The tape was only admitted, however, after defense counsel brought it into the case in an attempt to discredit the witness. It was not intended to be part of the state's case originally, and it was admitted for the sole purpose of allowing the jury to decide if a later identification had been tainted by improper suggestions.

The court was careful to point out: "Thus the admissibility of the tape depends neither on the reliability of hypnosis, nor on the truthfulness of any statements made while the witness was hypnotized." *State* v. *Nims,* supra, 598.

Courts of other jurisdictions have recognized the usefulness of hypnosis and narcoanalysis as investigative techniques, but they have usually rejected confessions so induced and statements made under hypnosis or drugs when offered by the subject on his own behalf.

The bases for this rejection have been hearsay, lack of scientific acceptance of the underlying premise, or the absence of a necessary foundation in the particular case. McCormick, Evidence (2d Ed.) pp. 507–10.

Many jurisdictions have simply adopted the test of *Frye* v. *United States,* 293 F. 1013 (D.C. Cir. 1923), and refused to admit testimony elicited by means of hypnosis or narcoanalysis on the grounds that those techniques have not achieved general acceptance in the scientific community.

A leading case on this subject is the New Jersey case of *State* v. *Hurd,* 86 N.J. 525, 432 A.2d 86 (1981), in which the court opted for admissibility but set out a series of six specific requirements with which a party must comply before introducing hypnotically refreshed testimony. These procedural safeguards were designed to reduce the opportunity for implanting suggestions.

While many states admit these types of extraordinarily induced testimony, there appears to be a trend toward exclusion. Thus, Maryland in 1968 permitted the testimony, ruling it was not hearsay but present recollection refreshed. The question became one of weight rather than admissibility. *Harding* v. *State,* 5 Md. App. 230, 246 A.2d 302 (1968). In 1983, however, the Maryland Court of Appeals referred to *Harding* v. *State* in a footnote and indicated its regrets for not granting certiorari in that case. It then adopted the test of *Frye* v. *United States,* supra, and decided that a witness who has been hypnotized may not testify about what was recalled when under hypnosis. (This does not preclude testimony in accord with statements made prior to hypnosis.) *State* v. *Collins,* 296 Md. 670, 464 A.2d 1028 (1983). Other states now espousing the *Frye* test include Minnesota; *State* v. *Mack,* 292 N.W.2d 764 (Minn. 1980); Massachusetts; *Commonwealth* v. *Kater,*

388 Mass. 519, 447 N.E.2d 1190 (1983); and Michigan. *People* v. *Gonzales,* 415 Mich. 615, 329 N.W.2d 743 (1982).

In 1982, in *People* v. *Shirley,* 31 Cal. 3d 18, 641 P.2d 775, 181 Cal. Rptr. 243 (1982), the California Supreme Court, in a leading opinion on this subject, adopted and enunciated its version of the *Frye* test. Concluding that hypnosis is a scientific method, the court decided that for its products to be admissible in court, hypnosis must be shown to be generally accepted in the scientific community for the purpose of memory retrieval. Rejecting the procedural safeguards of *Hurd,* the court held that posthypnotic testimony is inherently unreliable, citing studies which show the subjects to be extremely susceptible to suggestion, that subjects will combine irrelevant memories with fabricated memories and lies, and that neither the subject nor the hypnotist can tell whether a particular memory falls within one of these categories or another. Also, a subject will probably adhere to actual memories and "pseudo-memories" so that the traditional indicia of credibility (cross-examination, demeanor, scope of detail) may be useless. *People* v. *Shirley,* supra.

An examination of these cases and other reported decisions dealing with the subject of hypnosis and related techniques indicates that there are four groups into which court decisions seem to fall: There are still those that hold that hypnosis and similar techniques present questions of weight and credibility, and not admissibility; then there are those jurisdictions which hold that a witness' testimony is inadmissible if he has been hypnotized; others follow New Jersey and hold the hypnotically induced testimony admissible if certain procedural safeguards are followed; finally, there are those which hold that although a witness has been hypnotized, he may testify relative to matters he disclosed prior to hypnosis.

Reports of recent experiments on hypnotized subjects suggest that hypnosis has no place in the courtroom. William H. Putnam first reported in 1979 that his tests showed hypnotized subjects were more susceptible to distortion through suggestion and confabulation than nonhypnotized subjects. Putnam, "Hypnosis and Distortions in Eyewitness Memory," 27 Int'l J. Clin. & Exp. Hypnosis 437 (1979). In 1983, Glenn S. Sanders and William L. Simmons had subjects watch a twenty second videotape in which a thief was shown stealing a wallet. The thief wore a distinctive jacket. A week later, the subjects viewed a videotaped lineup. One half viewed a tape showing the thief without his distinctive jacket. The other half viewed a lineup in which someone else wore the distinctive jacket. Hypnotized subjects scored 17 percent correct responses, nonhypnotized subjects 40 percent on the lineup recognition test. On a test of those who felt confident enough to testify in court, the hypnotized group scored lower—20 percent v. 47 percent. In fact, hypnotized subjects ranked lower in each task, and on the structured recall test, hypnotized subjects were less likely than the control group (41 percent to 58 percent) to answer correctly. These results supported Putnam's findings that when questions were posed as leading questions, hypnotized subjects were more likely to respond incorrectly. Sanders & Simmons, "Use of Hypnosis to Enhance Eyewitness Accuracy: Does it Work?" 68 J. Applied Psychology 70 (1983).

Still another recent experiment found hypnotized subjects were much more likely to express certainty of the accuracy of their answers. Sheehan & Tilden, "Effects of Suggestibility and Hypnosis on Accurate and Distorted Retrieval from Memory," 9 J. Exp. Psychology 283 (1983).

The court concludes that this state should align itself with those jurisdictions which deny admissibility to

testimony elicited by the use of hypnotism and narcoanalysis. The processes have not achieved general acceptance in the scientific community. Even their proponents concede vulnerability, and a reading of the case law on the subject reveals repeatedly concerns over the risks and flaws of the processes. The experts in this scientific field are the persons to whom the courts must look for guidance in evaluating processes whose complexities are unfamiliar to judges. There is no consensus amongst these scientists and courts should not bestow respectibility on techniques which are apparently still scientifically unpredictable and unreliable.

The remaining issue raised by the defendant is addressed to the result which would appertain upon the court's denial of his motion to admit his induced testimony. The defendant argues that he would be denied the right to testify in his own behalf. The defendant states in his brief that he "knows of no case where a criminal defendant has been denied the right to testify because he has undergone a hypnotic interview."

This claim has been addressed by state courts and was addressed by a United States District Court in *Greenfield* v. *Robinson,* 413 F. Sup. 1113 (W.D. Va.), a 1976 case. Upholding the trial court, the court held that the refusal to permit the defendant to testify after hypnosis did not infringe upon his right to due process. Id., 1121. The court reasoned that a judge is not required "to accept evidence of uncertain value to go to a defense that is otherwise completely uncorroborated." Id., 1120. Nor must a judge accept evidence of "dubious quality." Id., 1121.

This defendant's right to due process is not affected by the court's conclusion above.

The defendant's "Motion For Use of Testimony Based on a Hypnotic Interview" requests, inter alia,

"that the defendant not be precluded from testifying to any matter upon which his recollection was refreshed under a hypnotic or sodium amytal interview." The defendant's motion is denied.