Vickie Lorene ROCK *v.* STATE of Arkansas

CR 85-215                                              708 S.W.2d 78

Supreme Court of Arkansas
Opinion delivered April 21, 1986
[Rehearing denied May 27, 1986.*]

* Purtle, J., not participating.

*Putnam & Maglothin,* by: *E.E. Maglothin* and *Jenniffer Morris Horan,* for appellant.

*Steve Clark,* Att'y Gen., by: *Clint Miller,* Asst. Att'y Gen., for appellee.

STEEL HAYS, Justice. Appellant was charged with manslaughter for the July 2, 1983 shooting of her husband. She was convicted and sentenced to ten years imprisonment and fined $10,000.

On appeal appellant's primary argument revolves around a hypnotic session conducted prior to the trial. Appellant could not remember everything about the shooting and without consulting the court nor informing the prosecutor, her attorney hired a psychiatrist to use hypnosis to induce recollection. Before hypnosis was begun, the psychiatrist, Dr. Bettye Back, interviewed appellant for an hour. Included in that interview was appellant's recollection of the shooting prior to hypnosis. No video or sound recording was made of the pre-hypnotic session, but Dr. Back made handwritten notes of the session.

The trial court ruled testimony of matters recalled by appellant due to hypnosis inadmissible because of its unreliability and because of the effect of hypnosis on cross-examination. Appellant was allowed to testify about things she remembered prior to being subjected to hypnosis, though testimony resulting from post-hypnotic suggestion was excluded. We believe the trial court's ruling was correct.

I

## HYPNOTICALLY REFRESHED TESTIMONY

Appellant makes two arguments relating to the court's ruling: the hypnotically refreshed testimony should have been admitted, and in the alternative, even assuming that such testimony is inadmissible, the trial court was unduly restrictive of appellant's testimony.

### Divergence of Opinion on Admissibility

Hypnotically refreshed testimony has resulted in a divergence of opinion as to its proper treatment in the courtroom. Most courts agree there is some inherent unreliability in hypnotically

refreshed testimony, but disagree as to how that affects admissibility. Some jurisdictions generally admit it, and do not view hypnotism as a matter of scientific procedure, but merely a matter of credibility to be weighed by the trier of fact. See *Clark v. State*, 379 So.2d 372 (Fla. Dist. Ct. App. 1979); *State v. Greer*, 609 S.W.2d 423 (Mo. App. 1980); *State v. McQueen*, 295 N.C. 96, 244 S.E.2d 414 (1978).

A second group of cases recognizes dangers in such testimony and allows it only if certain safeguards have been followed to minimize those dangers. See *State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981); *State v. Beachum*, 97 N.M. 682, 643 P.2d 246 (1981); *State v. Long*, 32 Wash. App. 732, 649 P.2d 845 (1982); *State v. Armstrong*, 110 Wis. 2d 555, 329 N.W.2d 386 (1983).

A third group of cases has found hypnotically refreshed testimony so unreliable the testimony is held inadmissible per se. See *People v. Shirley*, 31 Cal.3d 18, 181 Cal. Rptr. 243, 641 P.2d 775 (1982); *Collins* v. *Superior Court for the County of Maricopa*, 132 Ariz. 180, 644 P.2d 1266 (1982); *State v. Collins*, 52 Md. App. 186, 447 A.2d 1272 (1982); *State v. Mack*, 292 N.W.2d 764 (Minn. 1980); *People v. Hughes*, 59 N.Y.2d 523, 466 N.Y.S.2d 255 (1983); *Commonwealth v. Kater*, 388 Mass. 519, 447 N.E.2d 1190 (1983). (For a more comprehensive list of citations on the alignment of jurisdictions, see *People v. Shirley, supra*; *Collins v. Sup. Ct., supra*; *State v. Collins, supra*; *People v. Guerra*, 37 Cal.3d 385, 208 Cal. Rptr. 162, 690 P.2d 635 (1984).)

### Current Trend Toward Exclusion

While it was said in *State v. Hurd, supra*, that a majority of courts have held hypnotically induced testimony admissible, the cases cited for that conclusion are from the previous decade. (*Hurd*, at p. 91). The more recent trend is toward exclusion of such testimony. McCormick on Evidence § 206 (1984 3d ed.); *People v. Shirley, supra*; *State v. Atwood*, 39 Conn. Sup. 273, 479 A.2d 258 (1984). *Collins v. Sup. Ct., supra.* Typical of this trend is Maryland, which in 1968 permitted the testimony, treating the issue as one of weight rather than admissibility. *Harding v. State*, 5 Md. App. 230, 246 A.2d 302 (1968). *Harding* was the leading opinion on this point, yet in 1982 Maryland reversed its position and held that a witness who has been

hypnotized may not testify to induced recollections. *Polk* v. *State*, 48 Md. App. 382, 427 A.2d 1041 (1981); *State* v. *Collins*, *supra*. McCormick notes that even in those jurisdictions that previously held post-hypnotic testimony generally admissible, there is a trend toward insisting that rigorous safeguards be observed before the hypnotically refreshed memories are admissible, and "[t]he more prevalent view is that testimony about the post-hypnotic memories is not admissible." McCormick, *supra* at 623.

■   Courts adopting a rule of exclusion often rely on the test announced in *Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923), that an expert witness "may not testify on the basis of scientific methodology unless the principles on which he relies have achieved general acceptance within the scientific community." Some critics contend that *Frye* is too strict and will exclude helpful and probative evidence. McCormick, *supra* § 203; Latin and White, Remote Sensory Evidence and Environmental Law, 64 Cal. L. Rev. 1300 (1976). We do not have to resolve that issue in this case, as we would find the hypnotically refreshed testimony inadmissible by either the *Frye* test, or some form of it, or by traditional evidentiary concepts. Unif. R. Evid. 403. To this same effect see McCormick, *supra* at 633.

### Expert Opinion

While hypnosis may have gained recognition as an aid to therapy, it has not gained general acceptance as a means of ascertaining truth in the field of forensic law. Cases comprising the recent trend toward exclusion of hypnotically refreshed testimony have examined extensively the expert opinions in this field and have concluded that it is inherently unreliable and without sufficient acceptance to allow it in the courtroom. See, *People* v. *Shirley*, *supra*; *Collins* v. *Sup. Ct.*, *supra*; *Commonwealth* v. *Kater*, *supra*; *State* v. *Collins*, *supra*; *People* v. *Quintanar*, 659 P.2d 710 (Colo. App. 1982); *People* v. *Gonzales*, 415 Mich. 615, 329 N.W.2d 743 (1982); *People* v. *Hughes*, *supra*; *State* v. *Peoples*, 311 N.C. 515, 319 S.E.2d 177 (1984); *Commonwealth* v. *Nazarovitch*, 496 Pa. 97, 436 A.2d 170 (1981); *Peterson* v. *State*, 448 N.E.2d 673 (Ind. 1983); *Robinson* v. *State*, 677 P.2d 1980 (Okla. Cr. App. 1984); *State* v. *Mack*, *supra*; *State* v. *Atwood*, 3 Conn. Sup. 273, 479 A.2d 258 (1984).

Dr. Bernard L. Diamond, Professor of Clinical Psychiatry,

University of California at Berkeley, in his article, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 Cal. Law Review 313 (1980), states:

> I believe that once a potential witness has been hypnotized for the purpose of enhancing memory his recollections have been so contaminated that he is rendered effectively incompetent to testify. Hypnotized persons, being extremely suggestible, graft onto their memories fantasies or suggestions deliberately or unwittingly communicated by the hypnotist. After hypnosis the subject cannot differentiate between a true recollection and a fantasy or a suggested detail. Neither can any expert or the trier of fact. This risk is so great, in my view, that the use of hypnosis by police on a potential witness is tantamount to the destruction or fabrication of evidence. Recently, some courts have shown a healthy suspicion of the veracity of this sort of testimony. Yet even under stringent safeguards, including presentation to the trier of fact of the fullest possible information on the effects of hypnosis, the trier will not be able to sort out reality from witness fantasy and weigh this testimony properly.

*People* v. *Shirley*, *supra*, one of the leading cases for the rejection of hypnotically refreshed testimony, was recently reviewed in *People* v. *Guerra*, *supra*. The appellant in *Guerra* challenged the findings of *Shirley* as not being in step with recent developments in hypnosis in the scientific community. The California Supreme Court reviewed the studies and authorities since *Shirley* and found the experts even more cautious on the use of hypnosis in the courtroom. One of the more significant studies cited in *Guerra* is that of Dr. Martin T. Orne (Orne, et al., *Hypnotically Induced Testimony, In Eyewitness Testimony: Psychological Perspectives*, Wells & Loftus, edits. 1984). Orne is widely cited on this issue, and it was his guidelines for the use of hypnotic testimony that were adopted by the New Jersey court in *Hurd* v. *State*, *supra*. *Guerra* points out Orne's current position;

> After discussing *Shirley* and the decisions that preceded and followed it, the authors agree that "The present state of scientific knowledge is consistent with the rules of a number of state supreme courts that memories retrieved

through hypnosis are sufficiently unreliable that their use is precluded as eyewitness testimony in criminal trials. . .

There is no way, however, by which anyone (including an expert with extensive experience in hypnosis) can for any particular piece of information obtained in hypnosis determine whether it is an actual memory or a confabulation. For these reasons, hypnotically induced testimony is not reliable and ought not be permitted to form the basis of testimony in court."

The dangers of hypnosis in memory retrieval are summed up in the *Guerra* opinion: the subject's capacity to judge the reality of his memories is impaired; he is apt to recall "memories" that never existed, yet be convinced those memories are real; he will produce on demand a recollection of an event which may be a compound of actual facts, irrelevant matter and highly plausible "confabulations"; hypnosis artificially increases the subject's confidence in both his true and his false memories and may enhance his credibility as a witness due to an attendant ability to increase dramatically the amount of detail, or the emotion with which those details are reported, though they may be simply "artifacts of the hypnotic process." Too, there is the likelihood that juries will place greater emphasis on testimony produced by hypnosis. See *Collins* v. *Sup. Ct.*, *supra*.

Courts rejecting hypnotically refreshed testimony have been equally concerned with the effects on cross-examination, where the difficulties in memory retrieval and fabrication are compounded. The conviction on the part of the subject that he or she is stating the truth affects the truth finding process traditionally tested by cross-examination.

The concern in the area of post-hypnotic testimony is that post-hypnotic memory may be different than pre-hypnotic memory. This memory alteration may result from purposeful or unwitting cues given by the hypnotist, the phenomenon of confabulation, and the need for the subject to achieve some sense of certainty within his or her own mind. The basic problem is that if a witness sincerely believes that what he or she is relating is the truth they become resistant to cross-examination and immune to effective impeachment to ascertain the truth. *Collins* v.

*Sup. Ct., supra.*

█ Much more could be said on the subject of hypnotically induced recollection, but we are satisfied from the more recent cases and the views of experts, that the dangers of admitting this kind of testimony outweigh whatever probative value it may have.

### Conditional Admissibility—the Hurd Guidelines

Appellant urges that if we do not allow hypnotically refreshed testimony unconditionally, we should adopt the guidelines of *State* v. *Hurd, supra.*[1] We note that appellant has not

---

[1] These safeguards are well outlined by the New Jersey Supreme Court: Whenever a party in a criminal trial seeks to introduce a witness who has undergone hypnosis to refresh his memory, the party must inform his opponent of his intention and provide him with the recording of the session and other pertinent material. The trial court will then rule on the admissibility of the testimony either at a pretrial hearing or at a hearing out of the jury's presence. In reviewing the admissibility of hypnotically refreshed testimony, the trial court should evaluate both the kind of memory loss that hypnosis was used to restore and the specific technique employed based on expert testimony presented by the parties. The object of this review is not to determine whether the proffered testimony is accurate, but instead whether the use of hypnosis and the procedure followed in the particular case was a reasonably reliable means of restoring the witness' memory.

The first question a court must consider is the appropriateness of using hypnosis for the kind of memory loss encountered. The reason for a subject's lack of memory is an important factor in evaluating the reliability of hypnosis in restoring recall. According to defendant's expert, Dr. Orne, hypnosis often is reasonably reliable in reviving normal recall where there is a pathological reason, such as a traumatic neurosis, for the witness' inability to remember. Orne, supra, at 325. On the other hand, the likelihood of obtaining reasonably accurate recall diminishes if hypnosis is used simply to refresh a witness' memory or concerning details where there may be no recollection at all or to "verify" one of several conflicting accounts given by a witness. Id. at 324, 332. A related factor to be considered is whether the witness has any discernible motivation for not remembering or for "recalling" a particular version of the events. In either case, the possibility of creating self-serving fantasy is significant. . . .

Once it is determined that a case is of a kind likely to yield normal recall if hypnosis is properly administered, then it is necessary to determine whether the procedures followed were reasonably reliable. Of particular importance are the manner of questioning and the presence of cues or suggestions during the trance and the post-hypnotic period. . . . [citing Orne and others] An additional factor affecting the reliability of the procedure is the amenability of the subject to hypnosis. . . .

To provide an adequate record for evaluating the reliability of the hypnotic procedure, and to ensure a minimum level of reliability, we also adopt several procedural requirements based on those suggested by Dr. Orne and prescribed by the trial court. . . . Before it may introduce hypnotically refreshed testimony, a party must demonstrate compliance with these requirements.

fully complied with those guidelines, but we are not inclined to follow *Hurd* in any case. The cases which have rejected *Hurd* have noted that some of the dangers of hypnotically induced testimony are not eliminated by the *Hurd* guidelines and others are not even addressed.[2] See *People* v. *Shirley, supra, Collins* v. *Sup. Ct., supra.*

Of equal importance, to adopt the guidelines would further burden the pretrial process with no off-setting benefit: the guidelines require that the opposing party be notified of the intent to use hypnosis and be furnished a recording of any sessions; only

---

First, a psychiatrist or psychologist experienced in the use of hypnosis must conduct the session. . . .

Second, the professional conducting the hypnotic session should be independent of and not regularly employed by the prosecutor, investigator or defense.

Third, any information given to the hypnotist by law enforcement personnel or the defense prior to the hypnotic session must be recorded, either in writing or in other suitable form. . . .

Fourth, before inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them. . . .

Fifth, all contacts between the hypnotist and the subject must be recorded. This will establish a record of the preinduction interview, the hypnotic session, and the post-hypnotic period, enabling a court to determine what information or suggestions the witness may have received. . . .

Sixth, only the hypnotist and the subject should be present during any phase of the hypnotic session, including the prehypnotic testing and the post-hypnotic interview. . . . *State* v. *Hurd, supra.*

[2] In deciding to discard the *Hurd* approach, the *Shirley* court noted initially that it was not persuaded that the requirements adopted in *Hurd* and other cases would eliminate each of the dangers at which they were directed.

For example, one of the requirements set forth in *Hurd* is that all contacts between the hypnotist and the subject must be recorded for the stated purpose of enabling the trial court to determine what "cues" the hypnotist may have conveyed to the subject by word or deed; and the opinion strongly encouraged the use of videotape to make such recordings. Yet as the same opinion recognizes elsewhere, "Because of the unpredictability of what will influence a subject, it is difficult even for an expert examining a videotape of a hypnotic session to identify possible cues." If even an expert cannot confidently make that identification, it is vain to believe that a layman such as a trial judge can do so. 181 Cal. Rptr. at 255. f.n. 24

The court points out that certain dangers of hypnosis are not even addressed by the *Hurd* requirements recognized elsewhere in that opinion, such as the subject losing his critical judgment and crediting memories that were formerly viewed as unreliable, confusing actual recall with confabulation and the unwarranted confidence in the validity of his ensuing recollection.

a psychologist or psychiatrist experienced in hypnosis, and independent of either the state or the defense, may be used; all sessions must be recorded and the trial court in a pretrial or chambers hearing must decide a number of issues determinative of whether the induced testimony should be received, such as the presence of cues or suggestions by the hypnotist. The burden of proof is by clear and convincing evidence.

■ In light of the questionable probative value of such proof and the risks inherent in the means by which it is retrieved, we think it would be a serious mistake to further encumber the pretrial process with the steps outlined in *Hurd*. We agree with the comment in *People* v. *Shirley*, *supra*:

> On the other hand, it takes little prescience to foresee that these and related issues would provide a fertile new field for litigation. There would first be elaborate demands for discovery, parades of expert witnesses, and special pretrial hearings, all with concomitant delays and expense. Among the questions our trial courts would then be expected to answer are scientific issues so subtle as to confound the experts. Their resolution would in turn generate a panoply of new claims that could be raised on appeal, including difficult questions of compliance with the "clear and convincing" standard of proof. And because the hypnotized subject would frequently be the victim, the eyewitness, or a similar source of crucial testimony against the defendant, any errors in ruling on the admissibility of such testimony could easily jeopardize otherwise unimpeachable judgments of conviction. In our opinion, the game is not worth the candle.

### Appellant's Testimony Restricted

We turn to appellant's argument that the trial court's limitations on her testimony were too restrictive. Courts that decline to permit hypnotically refreshed testimony are often faced with the difficulty of dealing with a witness who has already undergone hypnosis. The concern focuses on determining what the witness could remember prior to hypnosis and insuring that the opposing party not be deprived of the opportunity for effective cross-examination because of the influence of hypnosis. *Collins* v. *Sup. Ct.*, *supra*.

■■ The likelihood of contamination was deemed so pronounced in *People* v. *Shirley, supra,* that the court ruled a previously hypnotized witness was wholly incompetent to testify on matters dealt with while under hypnosis. However, the general response has been to permit the testimony of those recollections held prior to hypnosis, and on topics unrelated to those covered by hypnosis. To ascertain just what those memories are and to render that testimony admissible, the courts require verification by way of a detailed record by the hypnotist of the pre-hypnotic session. A preferred method is video or sound recording, *Collins* v. *Sup. Ct., supra,* and some courts have suggested the *Hurd* guidelines be followed when pertinent to a particular case, *People* v. *Hughes, supra; Collins* v. *Sup. Ct., supra.* The *Hurd* guidelines, or something similar, are proposed as there is still a danger that the hypnosis could be so suggestive as to affect the pre-hypnotic memory as well. Once it has been shown by clear and convincing evidence that testimony of pre-hypnotic recollections is reliable, a subject may testify, but only to those memories demonstrably shown to be a product of the memory prior to hypnosis. The burden of proving the reliability is on the proponent of the testimony. *Commonwealth* v. *Kater, supra, People* v. *Shirley, supra, Collins* v. *Sup. Ct., supra, People* v. *Hughes, supra, State* v. *Atwood, supra.*

■ The trial court in this case chose the course of excluding testimony induced by hypnosis and admitting testimony of the appellant based on pre-hypnotic recollection. The difficulty was determining what that recollection was, based only on a record from the pre-hypnotic session with Dr. Back, a record admittedly incomplete. In this situation the trial court limited the appellant to what she could recall without the benefit of hypnosis, as evidenced by Dr. Back's notes and enlarged by Dr. Back's memory of her discussions with appellant before she was placed in a hypnotic state.

■ Appellant argues the court misapplied the rule employed by courts where hypnotically induced testimony is inadmissible and was too restrictive. Appellant, however, never demonstrated how the rule was violated. The rule simply limits the hypnotized subject's testimony to those matters demonstrably recalled prior to testimony. Any other testimony on the topic runs all the risks discussed earlier in hypnotically refreshed memories.

Here, the court was in a difficult position as the defense supplied only partial notes of the pre-hypnotic session. Nevertheless, the appellant was allowed to testify to those items referred to in the notes and given considerable latitude in explaining them in her own words. The trial court also allowed testimony on matters Dr. Back had previously testified were covered in the pre-hypnotic session. The burden was on appellant to establish a reliable record of the testimony. She cannot now claim error because the court restricted her to the record she offered.

Dr. Back testified that during the hypnotic session she took appellant back to her childhood and brought her forward to the shooting incident. Under these circumstances, in order to avoid testimony on topics covered in the sessions that were not previously preserved, the trial court could have limited appellant *entirely* to the notes and testimony of Dr. Back. However, to give appellant as much latitude as possible, the trial court applied that order only to the day of the shooting. Appellant complains that ruling was too restrictive and should have been limited to the explanation of the shooting incident itself. We find no support for this argument. Appellant does not deny that other events of the day were covered in the sessions, nor that they were relevant, but maintains the primary purpose of the session was to find out how the gun went off. While this may be so, the record reveals that the time covered in the sessions included the day of the shooting and, if anything, the ruling was generous. As noted in our discussion of appellant's next point, the most significant events of that day were included in Dr. Back's notes and appellant was able to testify to those matters.

Appellant suggests the better method of determining her pre-hypnotic memory would be her own recollection, and not the notes of Dr. Back. Appellant cites no authority and we think it would be circumventing the very reasons for excluding hypnotically refreshed memory to permit the witness to decide what was remembered naturally and what was induced by hypnosis. A similar suggestion was made in *Shirley*, to which the court responded:

> [I]t is the consensus of informed scientific opinion today that in no case can a person previously hypnotized to improve his recollection reliably determine whether any

unverified item of his testimony originates in his own memory or is instead a confusion or confabulation induced by the hypnotic experience. It would fly in the face of that consensus to allow a witness to be the judge of which portions of his testimony were actually produced by hypnosis.

## II

## CONSTITUTIONAL RIGHT TO TESTIFY

■ Appellant maintains the exclusion rule of hypnotically refreshed testimony should not be applied to defendants because it violates their constitutional right to testify in their own behalf. Of course, a defendant's right to testify is fundamental, but even that right is not without limits. A defendant with language difficulties, for example, may not eschew diligence and wait until the morning of trial to seek the assistance of an interpreter. *Figeroa* v. *State*, 244 Ark. 457, 425 S.W.2d 516 (1968). Even defendants are subject to the rules of procedure and evidence, such as hearsay, or other instances of evidentiary exclusion, e.g. evidence that is prejudicial, confusing, misleading, cumulative or time consuming.

In *Greenfield* v. *Robinson*, 413 F. Supp. 1113 (1976), the same argument was made by a defendant who had no recollection of the crime, a murder. He argued that hypnotic testimony was the only evidence he could offer in his defense, that it would be a violation of his constitutional rights to deny him the right to testify, citing *Chambers* v. *Mississippi*, 410 U.S. 284 (1973).

The cases are easily distinguishable, as the *Greenfield* court found. *Chambers* primarily found a hearsay exception for evidence offered by the defense because of reliability. The *Greenfield* court pointed out it was excluding the hypnotically induced testimony for the very reason that it was unreliable, after reviewing expert opinion on the issue. The court went on to say:

> This court knows of no rule that requires a judge to accept evidence of uncertain value to go to a defense that is otherwise completely uncorroborated. The mere fact that a crime has no eyewitnesses or direct evidence does not warrant a court to accept evidence that may be able to tell the trier of fact something about the crime, but may be of

dubious quality. As a constitutional principle then this court simply finds that petitioner's due process guarantees were not abrogated by the trial court's refusal to permit the defendant to relate his story under hypnosis. *Greenfield* at 1120-21.

In *State* v. *Atwood, supra,* a defendant charged with the murder of his wife had no recollection of the event and made the identical argument. The *Atwood* court had not previously considered the hypnosis problem and made a finding on that issue first, aligning itself with those jurisdictions which exclude hypnotically refreshed testimony. The court then dealt with appellant's constitutional right to testify in his behalf. Citing *Greenfield, supra,* the *Atwood* court decided it was not required to accept such testimony, even if it was all the defendant had, noting it was not required to "accept evidence of uncertain value that is otherwise completely uncorroborated." The court held the defendant's constitutional rights were not violated.

We think the same reasoning applies here. Appellant's testimony was restricted only by what, in effect, are standard rules of evidence. The probative value of the proffered testimony is questionable, as we have seen, but in any case, it is substantially outweighed by the other considerations discussed. We note that appellant was in a far better position than either defendant in *Atwood* or *Greenfield* who had no testimony to offer other than hypnosis, in that she was allowed to relate the substance of her version of the shooting to the jury, which she had remembered prior to hypnosis. Appellant's defense was that the shooting was an accident and this she was able to adequately relay to the jury. She testified that she and her husband were quarreling, that he pushed her against the wall, that she wanted to leave because she was frightened, and her husband wouldn't let her go. She said her husband's behavior that night was unusual, and the shooting was an accident, that she didn't mean to do it and that she would not intentionally hurt her husband.

In reality nothing was excluded that would have been of much assistance to appellant, or would have enlarged on her testimony to any significant degree. Yet given the available information on the effect of hypnosis and the attendant difficulties of such testimony, the state's desire to confine appellant's

testimony to the pre-hypnotic memories is warranted. The trial court was faced with a difficult situation at best when presented with a witness who had been hypnotized and the damage done before any ruling could be made. We think the trial court took the proper course in its ruling and any prejudice or deprivation caused to appellant in this case was minimal and resulted from her own actions and not by any erroneous ruling of the court. We can find no violation of her constitutional rights.

## III

### APPELLANT'S OUT-OF-COURT STATEMENT

Appellant alleges error in the trial court's exclusion of a statement in a police officer's report, attributed to the appellant, that she "had the gun in her hand and it went off." The statement was excluded as hearsay. Appellant relies on Unif. R. Evid. 801(d):

> Statements which are not hearsay. A statement is not hearsay if: (1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (ii) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive. . .

Rule 801 does not sustain the argument, as the proffered statement does not come within the exception. For the rule to apply, the prior consistent statement must be made *before* a motive to falsify has arisen:

> [I]f the attacker has charged bias, interest, corrupt influence, contrivance to falsify, or want of capacity to observe or remember, the applicable principle is that the prior consistent statement has no relevancy to refute the charge unless the consistent statement was made before the source of the bias, interest, influence or incapacity originated. McCormick on Evidence, § 49 (1984).

The same principle has been explained in other words:

> Some decisions also mention that the consistent statement should have been made before the witness would foresee its effect upon the fact issue. *Id.*, n. 24.

In *Brown* v. *State*, 262 Ark. 298, 556 S.W.2d 418 (1977), the defendant made the same argument. Brown testified that he was in Memphis at the time of the robbery. A witness was called to testify that Brown telephoned her that evening and said he was in Memphis. The statement was excluded as hearsay, Rule 801 having no application to the case, because "Brown, if guilty, had the same motive for fabrication when he made the alleged telephone call as he had when he testified in the case." We further stated in *Kitchen* v. *State*, 271 Ark. 1, 607 S.W.2d 345 (1980), the statements were not admissible "because the motive for fabrication was as great when the first statement was made as when the testimony was given."

Similarly, appellant's motive in describing the shooting as an accident at the time of arrest was the same as it would be when giving that testimony at trial. The court was correct in excluding the testimony as hearsay.

## IV

## INTRODUCTION OF HASHISH REFUSED

The final point of error concerns a small amount of hashish found in Frank Rock's shirt pocket following the shooting. There is no proof that he had used it, nor what the effects might be if he had, but appellant insists she should have been permitted to offer this proof as having relevance to the alleged violent behavior by Rock. The premise is too conjectural on this record and whether its relevance warranted acceptance was within the trial court's discretion. *Hamblin* v. *State*, 268 Ark. 497, 597 S.W.2d 589 (1980); Shelton v. State, 287 Ark. 322, 699 S.W.2d 728 (1986).

Affirmed.

PURTLE, J., not participating.