(No. 58276.—

.THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANDREW WILSON, Appellant.

*Opinion filed April 2, 1987.*

SIMON, J., took no part.

Barry Sullivan and Michael Palmer, of Chicago (Jenner & Block, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Andrew Wilson, was convicted on two counts each of murder and armed robbery. The same jury sentenced the defendant to death for the murder

convictions, and the trial judge imposed concurrent 30-year prison terms for the defendant's armed-robbery convictions. The death sentence was stayed pending direct appeal to this court. Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d Rules 603, 609(a).

The defendant's convictions stem from an occurrence on February 9, 1982, in which two Chicago police officers were killed. At about two o'clock that afternoon, Officers William Fahey and Richard O'Brien stopped an automobile on a street in the city. In the course of a scuffle with the occupants of the car, the officers were shot and their service revolvers were taken. The defendant and his brother, Jackie Wilson, were indicted and tried jointly for those offenses. At trial the State introduced into evidence inculpatory statements made by the defendant and his brother, and the State also presented eyewitness testimony and circumstantial evidence linking them to the crimes. The defendant and his brother were convicted of the murders and armed robberies, and the jury sentenced the defendant to death. The jury was unable to agree to impose that penalty on the defendant's brother, however, and he was instead sentenced to a term of natural life imprisonment for his two murder convictions.

I

The defendant first argues that the trial court erred in denying a motion to suppress his confession as involuntary. The evidence presented at the hearing on the defendant's suppression motion showed that he was arrested at 5:15 a.m. on February 14, 1982. The defendant spent the day in police custody; during the afternoon he was placed in a lineup, and beginning around 6 o'clock that evening he gave a statement, transcribed by a court reporter, in which he admitted shooting the two police officers. Later that night the defendant was taken by the police to Mercy Hospital, and witnesses there ob-

served some 15 separate injuries on the defendant's head, torso, and right leg.

At the suppression hearing the State attempted to establish that the defendant could not have incurred his injuries, with one exception, until after he gave his confession. The State presented the testimony of a number of persons who had contact with the defendant on February 14 during the period from his arrest until the conclusion of his formal confession; the witnesses were police officers who took part in the defendant's arrest and who interrogated him that day, as well as the assistant State's Attorney and the court reporter who were present when the defendant gave his formal confession. The State's witnesses uniformly denied that the defendant was threatened or beaten, and they testified that the only injury they noticed on the defendant while he was in their custody was one to his right eye. Several officers explained that the defendant apparently suffered the eye injury at the time of his arrest, when he was thrown to the floor and handcuffed. After the defendant was lifted from the floor, the officers saw that he had received a cut above his right eye. The defendant was wearing only trousers at the time, and no other injuries were noticed on his face or chest. The State also presented photographic evidence regarding the defendant's physical condition at two separate times during that day. First, a photograph was taken of the lineup in which the defendant appeared during the afternoon of February 14, and he was again photographed at 8:30 that evening, upon the completion of his confession; in both photographs the defendant is fully clothed and is shown facing forward.

At the suppression hearing the State also presented evidence that the defendant made a confession upon his arrival at the police station. Officers Thomas McKenna and Patrick O'Hara testified that they spoke with the defendant around 7 o'clock on the morning of his arrest

and that he waived the *Miranda* rights and then gave the officers, in oral form, substantially the same statement that he later made to the assistant State's Attorney. The officers did not ask the defendant to sign a waiver of his constitutional rights, nor did they preserve their notes of the discussion. The assistant State's Attorney, Lawrence Hyman, arrived at the police station around 8:30 a.m., and McKenna and O'Hara told him what the defendant had said. A court reporter, Michael Hartnett, got there about two hours later. Hyman did not see the defendant until 1:30 p.m., however, and he did not interview him until that evening. Hyman explained that he was busy "talking with the detectives and just synchronizing everyone."

The defendant testified that he was punched, kicked, smothered with a plastic bag, electrically shocked, and forced against a hot radiator throughout the day on February 14, until he gave his confession. This began when he arrived at the police station that morning. The defendant testified that when the officers later took him to see the assistant State's Attorney, Hyman, to make a statement, he mentioned the mistreatment, and Hyman told him to leave. Following that, the officers attempted to shock the defendant again. The officers then stretched him against a radiator, with his hands handcuffed to wall rings at opposite ends of the radiator. His face, chest, and legs were touching the radiator. According to the defendant, he incurred his eye injury not at the time of his arrest but rather later that day, when he was kicked by an officer. The defendant testified that he made his confession because of the mistreatment he had suffered. Doris Miller, a friend of the defendant, was also being held at the police station that day, and she testified that she heard the defendant being physically and verbally abused and calling for help. The defendant's brother, Jackie Wilson, testified similarly.

Defense counsel also presented extensive medical testimony and photographic evidence corroborating the defendant's injuries. Patricia Reynolds, a registered nurse, testified that the defendant arrived at the Mercy Hospital emergency room around 10:15 or 10:30 p.m. on February 14 in the company of two Chicago police officers, Ferro and Mulvaney. According to Nurse Reynolds, Officer Ferro said "that if this guy knew what was good for him he would refuse treatment." Reynolds then asked the defendant whether he wished to be treated, and he said that he did not. Later, however, while the officers were looking away, the defendant indicated that he did wish to be treated, and he signed a consent form at 10:50 p.m. Following that, the defendant was given a tetanus shot and was prepared for examination; Nurse Reynolds testified that after the defendant was undressed she observed injuries on his chest and a burn on his right thigh.

The defendant was examined at about 11:15 p.m. by Dr. Geoffrey Korn. Dr. Korn testified that he made note of some 15 separate injuries that were apparent on the defendant's head, chest, and right leg. Two cuts on the defendant's forehead and one on the back of his head required stitches; the defendant's right eye had been blackened, and there was bleeding on the surface of that eye. Dr. Korn also observed bruises on the defendant's chest and several linear abrasions or burns on the defendant's chest, shoulder, and chin area. Finally, Dr. Korn saw on the defendant's right thigh an abrasion from a second-degree burn; it was six inches long and 1½ to 2 inches wide.

Dr. Korn testified that as he prepared to suture the defendant's head and face wounds, he saw that Officer Mulvaney had drawn his service revolver. Fearing that the defendant's reaction to the shots of anesthesia might startle the officer, Dr. Korn asked that the weapon be

holstered. Mulvaney refused to put the gun away, however, and the doctor therefore left the room. Officer Ferro then went in the examining room and soon came out, explaining to the doctor that the defendant was now going to refuse treatment and would go to a different hospital. Dr. Korn testified that he attempted to persuade the defendant to agree to treatment but that the defendant would not change his mind. At 11:42 p.m. the defendant signed an "against medical advice" form indicating his refusal of treatment, and Officers Ferro and Mulvaney then took the defendant away.

At the suppression hearing Dr. Korn was shown photographs taken of the defendant on February 16, two days after the emergency-room examination. The photographs showed a number of abrasions or burns on the defendant's face, chest, and thigh, and Dr. Korn testified that, apart from having aged a few days, the injuries depicted in the photographs were essentially the same as what he had seen in his examination.

Dr. John M. Raba, medical director of the facility that provides health services for the Cook County jail, also testified in the defendant's behalf at the suppression hearing. Dr. Raba examined the defendant early in the evening on February 15, after receiving from one of his staff physicians a report about the defendant and what was termed his "unusual" injuries. According to Dr. Raba, the defendant explained that he had been beaten, electrically shocked, and held against a radiator. Dr. Raba saw that the defendant had injuries to his right eye, bruises and lacerations on his forehead, and blistering wounds on his face, chest, and right leg.

The trial judge denied the defendant's motion to suppress his confession. The trial judge found that the defendant suffered a cut in the area of his right eye at the time of his arrest but that other facial injuries were shown not to have occurred until after 8:30 p.m., when

the confession photograph was taken. The trial judge believed that the injuries to those parts of the defendant's body not visible in the photograph—his shoulder, chest, and leg—were minor or superficial. In making that assessment, the trial judge apparently was relying on Dr. Korn's statement, on cross-examination, that the defendant's wounds could be termed superficial because they did not require major surgery. The trial judge concluded that the defendant's confession was voluntary.

The State must establish, by a preponderance of the evidence, the voluntary nature of a defendant's confession. (*Lego v. Twomey* (1972), 404 U.S. 477, 489, 30 L. Ed. 2d 618, 627, 92 S. Ct. 619, 626-27; *People v. Caballero* (1984), 102 Ill. 2d 23, 33; Ill. Rev. Stat. 1983, ch. 38, par. 114—11(d).) The evidence here shows clearly that when the defendant was arrested at 5:15 a.m. on February 14, he may have received a cut above his right eye but that he had no other injuries; it is equally clear that when the defendant was taken by police officers to Mercy Hospital sometime after 10 o'clock that night he had about 15 separate injuries on his head, chest, and leg. The inescapable conclusion is that the defendant suffered his injuries while in police custody that day, and indeed the State does not dispute that. Rather, the State believes that the evidence in this case shows that the defendant did not incur his injuries until after he gave his written confession, which was completed at 8:30 that evening. See *People v. Alexander* (1968), 96 Ill. App. 2d 113, 120.

In making this argument, the State points first to the photographs, which it says show only the eye injury that the defendant suffered at the time of his arrest. One of the photographs was taken in the afternoon of February 14, at the lineup, and the other photograph was taken at 8:30 that evening, following the defendant's confession. The State notes Dr. Korn's testimony that he could not

see in the post-confession photograph certain facial injuries that were apparent later that night in the emergency room, and that fresh blood was observable on the defendant's face when he arrived at Mercy Hospital. Moreover, certain civilian witnesses, such as the defendant's brother, were present at the lineup but did not say that they saw any injuries on the defendant at that time. This evidence accounts only for injuries to the defendant's face, however. In the photographs the defendant is fully dressed, and he is shown facing forward. We note too that the lineup photograph was taken at a distance, and that the post-confession photograph is of poorer quality.

As additional support for its argument that all the injuries occurred after the defendant confessed, the State refers to an estimate given by Dr. Korn of the age of one of the defendant's burns. Asked about the length of the burn on the defendant's leg, Dr. Korn gave the unresponsive answer that it was "roughly speaking, *** fairly recent, within eight hours." The State believes that this shows that the defendant's injuries were recent and contends that it is inconsistent with defense claims that abuse also occurred during the morning of February 14. But Dr. Korn's answer actually was consistent with the defendant's own testimony that he was forced against the radiator sometime in the afternoon on February 14. Moreover, the age of the burn is not inconsistent with defense testimony that other forms of abuse occurred in the morning.

Finally, the State points to the testimony of the police officers, the assistant State's Attorney, and the court reporter, who denied that the defendant was threatened or harmed. The State chose not to present the testimony of Officers Ferro and Mulvaney, who took the defendant to Mercy Hospital at 10:30 p.m., or the testimony of anyone who had contact with the defendant after the confession

photograph was taken at 8:30 that night—the defendant was not out of the presence of police officers during that day. The inference that the State would have us draw is that the defendant must have suffered the great bulk of his injuries during that two-hour gap in its evidence.

This court has held that when it is evident that a defendant has been injured while in police custody, the State must show, by clear and convincing evidence, that the injuries were not inflicted as a means of producing the confession. (*People v. Davis* (1966), 35 Ill. 2d 202, 206; *People v. La Frana* (1954), 4 Ill. 2d 261, 267; *People v. Thomlison* (1948), 400 Ill. 555, 561-62.) This requires more than the mere denial by the State's witnesses that the confession was coerced. In *People v. La Frana* (1954), 4 Ill. 2d 261, 267, the court explained:

> "Where the only evidence of coercion is the defendant's own testimony, and where this is contradicted by witnesses for the People, then of course the trial court may choose to believe the latter, and our recognition of the superior position of the trial court to evaluate the credibility of the witnesses before it makes us reluctant to reverse its determination. (*People v. Viti* [1951], 408 Ill. 206; *People v. Varela* [1950], 405 Ill. 236.) But where it is conceded, or clearly established, that the defendant received injuries while in police custody, and the only issue is how and why they were inflicted, we have held that something more than a mere denial by the police of coercion is required. Under such circumstances the burden of establishing that the injuries were not administered in order to obtain the confession, can be met only by clear and convincing testimony as to the manner of their occurrence. See *People v. Thomlison* [1948], 400 Ill. 555."

Contrary to the State's argument, we believe that *La Frana* is applicable here. The requirement of clear and convincing evidence is as relevant in a case such as this, in which the question is when the injuries occurred,

as it is in a case in which the question is how or why the injuries occurred. Here it was "conceded, or clearly established, that the defendant received injuries while in police custody" (*People v. La Frana* (1954), 4 Ill. 2d 261, 267), and the only question for the purpose of our inquiry is when they were inflicted. Accordingly, "more than a mere denial by the police of coercion [was] required" (4 Ill. 2d 261, 267), and it was necessary for the State to show by clear and convincing evidence that the injuries did not occur before the defendant gave his confession. We do not believe that the burden was met here. Although the State presented evidence that could account for when some of the defendant's facial injuries occurred, the others were not explained, and with respect to those injuries the State essentially relied on a mere denial of coercion.

The decisions relied on by the State to support the trial court's ruling are not on point. In those cases either there was no medical corroboration that injuries had been incurred (see *In re Lamb* (1975), 61 Ill. 2d 383; *People v. Johnson* (1970), 44 Ill. 2d 463; *People v. Taylor* (1968), 40 Ill. 2d 569; *People v. Carter* (1968), 39 Ill. 2d 31; *People v. Hall* (1967), 38 Ill. 2d 308; *People v. Strayhorn* (1965), 35 Ill. 2d 41; *People v. Golson* (1965), 32 Ill. 2d 398), or there was an adequate explanation for the injuries (see *People v. Pittman* (1973), 55 Ill. 2d 39; *People v. Scott* (1963), 29 Ill. 2d 97; *People v. Wilson* (1963), 29 Ill. 2d 82). In contrast, the defendant's injuries in this case cannot be disputed, and only several facial injuries were explained by the State. Because the State failed to show by clear and convincing evidence that the confession was not the product of coercion—the burden imposed by *La Frana*—the defendant's statement should have been suppressed as having been involuntarily given. The use of a defendant's coerced confession as substantive evidence of his guilt is never harmless error, and the cause must therefore be re-

manded for a new trial. *Payne v. Arkansas* (1958), 356 U.S. 560, 568, 2 L. Ed. 2d 975, 981, 78 S. Ct. 844, 850; see *Rose v. Clark* (1986), 478 U.S. 570, 577-78, 92 L. Ed. 2d 460, 470, 106 S. Ct. 3101, 3105-06; *Chapman v. California.* (1967), 386 U.S. 18, 23 n.8, 17 L. Ed. 2d 705, 710 n.8, 87 S. Ct. 824, 828 n.8.

## II

We shall also consider several other questions that are likely to arise in the course of the defendant's retrial. One of the State's two eyewitnesses at trial was Tyrone Sims, who testified that he had observed the shooting from inside his home. On February 10, 1982, Sims was taken to Dr. Bennett Braun to undergo hypnosis to assist him in recalling the license plate number of the car that the police officers had stopped; under hypnosis Sims purported to recall an Illinois license plate number. Two days later, on February 12, Sims identified from a photographic array two men—not the defendant and his brother—as the persons who had shot the officers; the next day Sims viewed a lineup containing those two persons and retracted his identification. One of these men implicated the Wilsons, however, and at a lineup on February 14 Sims also identified the Wilsons as the persons who had shot the officers.

The defendant filed a pretrial motion to bar or limit the use of Sims' testimony, contending that the witness' recollection of the shooting and his identification of the defendant had been induced or influenced by the session of hypnosis. The State contended that the only hypnotically induced recollection by Sims was the license plate number, which would not be used at trial. Defense counsel sought to present expert testimony to the effect that suggestions and statements made by the hypnotist during the session could have affected Sims' identification of the defendant and his recollection of the shooting. The

trial judge denied the request. After viewing the videotape of the hypnosis session, the trial judge determined that the license plate number was the only hypnotically induced recollection and ruled that Sims would be allowed to testify about anything that he remembered independently of the hypnosis. Defense counsel then requested a hearing to determine Sims' prehypnotic recollection. The trial judge denied the request, finding that Sims' recollection of events occurring before the hypnosis session was adequately set forth in a police report prepared on February 16, six days after the hypnosis session, and in the videotape of Dr. Braun's prehypnotic interview with the witness. Later, during trial, defense counsel attempted to introduce expert testimony that Sims' recollection of the shooting and his pretrial and trial identifications of the defendant were hypnotically influenced. Defense counsel also attempted to introduce expert evidence to explain to the jury the effect that hypnosis may have had on Sims' testimony. The trial judge denied the requests, holding that Sims' testimony was untainted by the hypnosis. The court did allow defense counsel to question the hypnotist, Dr. Braun, for the limited purpose of impeaching Sims' testimony with prior inconsistent statements.

Although hypnosis is widely recognized as a form of therapy, its value as a memory-enhancing aid for forensic purposes is disputed. The professional literature on the subject, together with the offers of proof submitted by the defendant in this case, show that hypnosis can influence a subject in subtle yet significant ways. A person in a hypnotic state is highly suggestible, and unintended cues from the hypnotist or others may affect the subject's recall. Moreover, under hypnosis a person may confabulate and fill in gaps in his memory with guesses or uncertain perceptions. Hypnosis may also cause the subject to cement an uncertain recollection, giving it the

aura of unshakable certainty. Thus, hypnosis may provide a beneficial form of therapy and may even be useful as an investigatory aid, but it also can significantly reduce a subject's value as a trial witness. See Council on Scientific Affairs, *Scientific Status of Refreshing Recollection by the Use of Hypnosis*, 253 J.A.M.A. 1918 (1985); Orne, *The Use and Misuse of Hypnosis in Court*, 27 Int'l J. of Clinical & Experimental Hypnosis 311 (1979).

This court has not previously ruled on the admissibility of post-hypnotic testimony (see *People v. Cohoon* (1984), 104 Ill. 2d 295, 299), though the appellate court has considered a number of these issues (see *People v. Gibson* (1983), 117 Ill. App. 3d 270; *People v. Smrekar* (1979), 68 Ill. App. 3d 379). Some jurisdictions have held that hypnotically induced testimony is always admissible, and that the fact of hypnosis pertains to the witness' credibility rather than to his competency. (See, *e.g.*, *State v. Brown* (N.D. 1983), 337 N.W.2d 138; *Chapman v. State* (Wyo. 1982), 638 P.2d 1280.) Other courts, applying a rule of *per se* inadmissibility, have held that hypnotically induced testimony must always be excluded from evidence. (See, *e.g.*, *Contreras v. State* (Alaska 1986), 718 P.2d 129; *State ex rel. Collins v. Superior Court* (1982), 132 Ariz. 180, 644 P.2d 1266; *Rock v. State* (1986), 288 Ark. 566, 708 S.W.2d 78, *cert. granted* (1986), 479 U.S. 947, 93 L. Ed. 2d 381, 107 S. Ct. 430; *People v. Shirley* (1982), 31 Cal. 3d 18, 641 P.2d 775, 181 Cal. Rptr. 243; *Commonwealth v. Kater* (1983), 388 Mass. 519, 447 N.E.2d 1190; *People v. Gonzales* (1982), 415 Mich. 615, 329 N.W.2d 743, *modified* (1983), 417 Mich. 1129, 336 N.W.2d 751; *State v. Mack* (Minn. 1980), 292 N.W.2d 764; *State v. Palmer* (1981), 210 Neb. 206, 313 N.W.2d 648; *People v. Hughes* (1983), 59 N.Y.2d 523, 453 N.E.2d 484, 466 N.Y.S.2d 255; *State v. Peoples* (1984), 311 N.C. 515, 319 S.E.2d 177; *Commonwealth v.*

*Nazarovitch* (1981), 496 Pa. 97, 436 A.2d 170.) Finally, a number of State and Federal courts have followed a middle course, allowing the introduction of hypnotically induced testimony if the proponent of the evidence is able to demonstrate that it was produced under conditions that would reduce, if not eliminate, the prejudicial dangers of the hypnotic process. See, *e.g., Sprynczynatyk v. General Motors Corp.* (8th Cir. 1985), 771 F.2d 1112; *United States v. Valdez* (5th Cir. 1984), 722 F.2d 1196; *State v. Iwakiri* (1984), 106 Idaho 618, 682 P.2d 571; *State v. Hurd* (1981), 86 N.J. 525, 432 A.2d 86; *State v. Armstrong* (1983), 110 Wis. 2d 555, 329 N.W.2d 386.

We need not determine at this time whether hypnotically induced testimony may ever be admitted into evidence, for that question is not before us. In this case the trial judge barred the State from introducing any hypnotically induced testimony, and rather than ask for a less severe restriction, the State insists that no part of Sims' trial testimony was induced by hypnosis. We must therefore decide a related question—whether a previously hypnotized witness may testify regarding his prehypnotic recollection.

Significantly, in many of those jurisdictions in which hypnotically induced testimony is either excluded from evidence or admitted only on a case-by-case basis, courts that have considered the question generally have allowed a previously hypnotized witness to testify regarding his prehypnotic recollection. This has been the result in a number of States that bar the admission of hypnotically induced testimony. (See, *e.g., Contreras v. State* (Alaska 1986), 718 P.2d 129; *State ex rel. Collins v. Superior Court* (1982), 132 Ariz. 180, 644 P.2d 1266 (supplemental opinion); *Rock v. State* (1986), 288 Ark. 566, 708 S.W.2d 78, *cert. granted* (1986), 479 U.S. 947, 93 L. Ed. 2d 381, 107 S. Ct. 430; *Commonwealth v. Kater* (1983), 388 Mass. 519, 447 N.E.2d 1190; *State v. Koehler* (Minn.

1981), 312 N.W.2d 108; *State v. Patterson* (1983), 213 Neb. 686, 331 N.W.2d 500; *State v. Peoples* (1984), 311 N.C. 515, 319 S.E.2d 177; *Commonwealth v. Taylor* (1982), 294 Pa. Super. 171, 439 A.2d 805.) The same result has also been reached in jurisdictions that make case-by-case determinations of the admissibility of hypnotically induced testimony. See, *e.g., State v. Iwakiri* (1984), 106 Idaho 618, 682 P.2d 571; *State v. Armstrong* (1983), 110 Wis. 2d 555, 329 N.W.2d 386.

The view has been criticized, however. In *People v. Guerra* (1984), 37 Cal. 3d 385, 690 P.2d 635, 208 Cal. Rptr. 162, the California Supreme Court suggested that testimony purportedly derived from a witness' prehypnotic recollection would suffer from the same defects as hypnotically induced testimony, which the court had previously held could not be admitted into evidence (*People v. Shirley* (1982), 31 Cal. 3d 18, 641 P.2d 775, 181 Cal. Rptr. 243). Because the question was not squarely presented, however, *Guerra* did not decide whether testimony of that sort would ever be allowed. In *State v. Brown* (N.D. 1983), 337 N.W.2d 138, the North Dakota Supreme Court believed that it would be inconsistent to allow testimony based on prehypnotic recollection while barring hypnotically induced testimony. The court adopted the rule that hypnotically induced testimony is generally admissible, however, which made it unnecessary to decide whether, as a separate matter, testimony based on prehypnotic recollection may ever be introduced.

One commentator has noted that "the admission of even pre-hypnotic memories carries with it too many of the most serious evils of post-hypnotic recall." (I. Mickenberg, *Mesmerizing Justice: The Use of Hypnotically-Induced Testimony in Criminal Trials*, 34 Syracuse L. Rev. 927, 971 (1983).) But a witness' memory regarding his prehypnotic recollection would seem to escape the

more significant problems posed by hypnosis; because the testimony is based on information related by the witness before undergoing hypnosis, confabulation and suggestibility could not have had any effect. The main danger appears to lie in the bolstered confidence that hypnosis may impart even to testimony based on pre-hypnotic recollection, and an argument may be made that the use of bolstered testimony against a defendant in a criminal proceeding would violate his right to confront the witnesses against him.

A similar argument was rejected in *Clay v. Vose* (1st Cir. 1985), 771 F.2d 1. In *Clay* a witness initially made a somewhat uncertain identification of the defendant from an array of photographs as one of three men whom the witness saw entering a taxi cab; the cab driver was murdered later that night. Following a session of hypnosis, in which the witness was instructed to review the events, the witness viewed the photographic array again, and on that occasion he positively identified the defendant as one of the three men. He also repeated his identification of another man but was unable to identify the third. The witness was hypnotized some time later, with similar results. At trial the witness identified the defendant in court, and information concerning the photographic identifications, including the witness' increased confidence in making them, was also introduced.

In *Clay* the court rejected the defendant's argument that the increased confidence produced by hypnotizing the witness worked a denial of the sixth amendment right of confrontation. The court explained:

"That Dwyer's [*i.e.*, the witness'] hypnosis might have increased his confidence in his identification of Clay and made it more difficult for Clay's counsel to question him effectively does not necessarily mean that the admission of Dwyer's testimony violated Clay's sixth amendment right to confrontation. *** As construed by the Supreme

Court, 'a primary interest secured by [the clause] is the right of cross-examination.' The Court has also stated that the two purposes served by cross-examination are to allow the defendant to impeach a witness's credibility and to expose a witness's biases and possible motives for testifying. Fulfillment of these two purposes is so central to the meaning of the confrontation clause that the Ninth Circuit has held that 'once cross-examination reveals sufficient information to appraise the witness's veracity, confrontation demands are satisfied.' " (771 F.2d 1, 4.)

The court in *Clay* noted that the witness was cross-examined; that the jury was informed of the hypnosis, heard a tape recording of each of the two sessions, and was presented with opposing expert testimony on the subject; that the witness had made a prehypnotic identification of the defendant; and that the jury was instructed on the effects of hypnosis.

Thus, the confrontation clause does not necessarily prohibit the use of testimony based on a witness' prehypnotic recollection, even though the witness' confidence in his memory has been bolstered to some degree by the hypnosis. A total bar on testimony derived from prehypnotic recollection would therefore exact an unnecessary toll. "A criminal trial for rape or assault would present an odd spectacle if the victim was barred from saying anything, including the fact that the crime occurred, simply because he or she submitted to hypnosis sometime prior to trial to aid the investigation or obtain needed medical treatment." (*People v. Hughes* (1983), 59 N.Y.2d 523, 545, 453 N.E.2d 484, 495, 466 N.Y.S.2d 255, 266.) We agree that this approach strikes "a more realistic balance" between the problems of hypnosis and the drastic effect of a total ban on testimony from previously hypnotized witnesses regarding matters touched on in the hypnotic session. (See Ruffra, *Hypnotically Induced Testimony: Should It Be Admitted?* 19 Crim. L. Bull. 293, 321 (1983).) The proponent of the testimony should establish

the nature and extent of the witness' prehypnotic recall. The parties should also be permitted to present expert testimony to explain to the trier of fact the potential effects of hypnosis. This approach, which essentially corresponds to that adopted by a number of other States (see, e.g., *State ex rel. Collins v. Superior Court* (1982), 132 Ariz. 180, 210, 644 P.2d 1266, 1296 (supplemental opinion); *State v. Iwakiri* (1984), 106 Idaho 618, 626-27, 682 P.2d 571, 579-80; *Commonwealth v. Kater* (1983), 388 Mass. 519, 526, 447 N.E.2d 1190, 1197; *State v. Armstrong* (1983), 110 Wis. 2d 555, 564, 329 N.W.2d 386, 395), effectively meets the problems associated with hypnosis and its potential influences on a witness' testimony regarding his prehypnotic recollection.

In this case, then, the trial judge correctly ruled that Sims could testify to his prehypnotic recollection. The parties did not agree, however, on the extent of the witness' recollection. For example, in a police report prepared six days after the hypnosis, Sims is said to have given a prehypnotic description of the assailants; the report does not say what the description was, however. Sims did not view the defendant until after the hypnosis session, and therefore the State, unless it chooses to argue for the admission of hypnotically induced testimony, must demonstrate to the court that the post-hypnotic identification of the defendant was anchored in the witness' prehypnotic recollection. The defendant's proffered expert testimony on the effects of hypnosis would assist the trial judge in making that determination. Finally, the defendant should be permitted to present at trial expert testimony on hypnosis, which would aid the jurors in understanding the potential effects of hypnosis on Sims' testimony.

## III.

The defendant also argues that the trial court erred

in denying a motion to suppress the identification testimony of Tyrone Sims. An in-court identification made by Sims of the defendant allegedly was based on an identification made at the lineup on February 14, 1981, and the defendant believes that he was entitled to the presence of counsel at the lineup. The defendant argues that the procedure used in obtaining the warrant for his arrest marked the beginning of adversary proceedings and therefore triggered his right to counsel at critical stages before trial. See *United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926.

The right to counsel attaches with the initiation of adversary proceedings against a defendant, and that may occur by formal charge, preliminary hearing, indictment, information, or arraignment. (*Brewer v. Williams* (1977), 430 U.S. 387, 398, 51 L. Ed. 2d 424, 436, 97 S. Ct. 1232, 1239; *Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1882 (plurality opinion).) It has not been held, however, that an arrest, by itself, triggers the right to counsel. (*United States v. Gouveia* (1984), 467 U.S. 180, 189-90, 81 L. Ed. 2d 146, 155-56, 104 S. Ct. 2292, 2298-99.) This court has not previously decided whether the filing of a complaint by a police officer to obtain an arrest warrant signals the initiation of adversary proceedings. (See *People v. Owens* (1984), 102 Ill. 2d 88; see generally Robinson, *Defendant's Pre-indictment Sixth Amendment Right to Counsel: Its Attachment and Waiver*, 74 Ill. B.J. 484 (1986).) In this case, the police officer presented a complaint for an arrest warrant to a judge on February 13, pursuant to statute. (See Ill. Rev. Stat. 1983, ch. 38, par. 107—9(c).) The complaint was presented to the judge *ex parte*, it was done by a police officer rather than by an assistant State's Attorney, and the complaint was not filed in court until after the defendant appeared in the lineup. We do not believe that the procedure followed

here can fairly be construed as the beginning of adversary proceedings between the State and the defendant. See *People v. Racanelli* (1985), 132 Ill. App. 3d 124, 130-31; *People v. Boswell* (1985), 132 Ill. App. 3d 52, 57-60.

The defendant also argues that, at the hearing on the motion to suppress Sims' identification, the trial court erred in precluding the defense from making certain inquiries. Defense counsel sought to question Sims regarding photographic displays that the witness viewed before making his lineup identification of the defendant and his brother on February 14. Sims had identified two other persons from an earlier photographic array, and counsel's avowed aim was to investigate ways in which Sims had come to "unidentify those other people" and come to "identify these." The trial judge required counsel to limit his questions to the February 14 lineup, in which the defendant appeared. We cannot say that the trial judge's ruling was in error, for there was no showing that the February 14 lineup was conducted in a suggestive manner.

The defendant also contends that the trial court erred in denying his motion to suppress a sawed-off shotgun and the officers' service revolvers, which were seized at the beauty shop where the defendant lived and worked. The defendant argues that in searching the premises the police could take only items that were in plain view, and he contends that the weapons were hidden.

The trial judge found that the police were lawfully on the premises and that they discovered the weapons in plain view. The trial judge credited the testimony of Detective Gorman, who said that he went to the shop to arrest the defendant on an unrelated arrest warrant. Detective Gorman testified that he found the weapons after climbing on something to look for the defendant in a possible hiding place above a stairwell. The detective testified that the revolvers were fully visible and that the

shotgun was partly enclosed in a brown paper bag. In light of Gorman's testimony, which the trial judge chose to accept, the court's findings are not manifestly erroneous. See *People v. Neal* (1985), 109 Ill. 2d 216, 219.

The defendant also argues that the trial court erred in admitting evidence of an outstanding warrant for his arrest at the time of the occurrence here. The State introduced the evidence to show that the defendant had a motive for killing the police officers—to avoid arrest. But the State did not produce any evidence that the defendant knew that the warrant existed, or even that the officers were arresting the defendant pursuant to the warrant. The existence of the arrest warrant does not by itself show that the defendant was trying to avoid apprehension. Unless the defendant knew about the warrant or knew that the officers were attempting to arrest him, the existence of the warrant does not establish anything about the defendant's state of mind. *People v. Witherspoon* (1963), 27 Ill. 2d 483, *People v. Doody* (1931), 343 Ill. 194, and *People v. Durkin* (1928), 330 Ill. 394, which the State cites, are distinguishable, for in each of those cases there was evidence that the defendant knew that he was wanted by the police.

The defendant raises a number of other arguments against his convictions and his death sentence, but they are questions that are unlikely to recur on retrial or questions that need not be considered in this appeal. For the reasons stated, the defendant's convictions are reversed, his sentences are vacated, and the cause is remanded for a new trial.

*Reversed and remanded.*

JUSTICE SIMON took no part in the consideration or decision of this case.