Andrew WILSON, Plaintiff–Appellant,

v.

CITY OF CHICAGO, Jon Burge, et al., Defendants–Appellees.

Nos. 89–3747, 90–2216.

United States Court of Appeals, Seventh Circuit.

Argued June 1, 1993.

Decided Oct. 4, 1993.

Order on Rehearing Modifying Judgment Dec. 8, 1993.

G. Flint Taylor and John L. Stainthorp, argued, Jeffrey H. Haas, Peoples Law Office, Chicago, IL, for plaintiff-appellant.

Patrick E. Mahoney, William J. Kunkle, Jr., argued, Jeffrey M. Rubin, David K. Greene, Pope & John, Chicago, IL, for Jon Burge, Patrick O'Hara and John Yucaitis in No. 89–3747.

John F. McGuire, Arthur Mooradian, Asst. Corp. Counsel, Office of the Corp. Counsel, Bobbie McGee Gregg, Asst. U.S. Atty., argued, Lynn K. Mitchell, Kelly R. Welsh, Asst. Corp. Counsel, Office of the Corp. Counsel, Appeals Div., Chicago, IL, for City of Chicago in No. 89–3747.

John F. McGuire, Arthur Mooradian, Asst. Corp. Counsel, Office of the Corp. Counsel, Ruth M. Moscovitch, Asst. Corp. Counsel, Bobbie McGee Gregg, Asst. Atty. Gen., argued, Lynn K. Mitchell, Kelly R. Welsh, Asst. Corp. Counsel, Office of the Corp. Counsel, Appeals Div., Chicago, IL, for City of Chicago, Richard Brzeczek in No. 90–2216.

William J. Kunkle, Jr., argued, Jeffrey M. Rubin, David K. Greene, Pope & John, Chicago, IL, for Jon Burge, Michael McKenna, Patrick O'Hara, John Yucaitis and Officer Mulvaney in No. 90–2216.

Patrick E. Mahoney, Chicago, IL, for Officer Ferro in No. 90–2216.

Before POSNER, Chief Judge, and COFFEY and EASTERBROOK, Circuit Judges.

POSNER, Chief Judge.

In 1982 Andrew Wilson shot and killed two Chicago policemen. He was convicted of first-degree murder and sentenced to death. The Supreme Court of Illinois reversed his conviction on the ground that his confession, which had been part of the evidence against him at trial, had been coerced. *People v. Wilson*, 116 Ill.2d 29, 106 Ill.Dec. 771, 506 N.E.2d 571 (1987). Wilson had "testified that he was punched, kicked, smothered with a plastic bag, electrically shocked, and forced against a hot radiator throughout the day on February 14 [the day of his arrest], until he gave his confession," *id.*, 106 Ill.Dec. at 773, 506 N.E.2d at 573, and his testimony had been corroborated by extensive contemporaneous medical and photographic evidence.

Wilson was retried, again convicted, and this time sentenced to life in prison without possibility of parole; his appeal from the second conviction is pending. Meanwhile he had brought this suit for damages under 42 U.S.C. § 1983, claiming that the torture inflicted upon him to make him confess denied his right to due process of law. Named as defendants were the City of Chicago and several police officers, including a lieutenant, Jon Burge, who were alleged to have participated in the torture of Wilson. A first trial, which lasted eight weeks, ended in a hung jury. A second trial of the same length resulted in a special verdict that, while finding that Wilson's constitutional rights had been violated, exonerated all the officers. Although the jury found that the City of Chicago had had a de facto policy authorizing its police officers physically to abuse persons suspected of having killed or injured a police officer, the jury also found that the policy had not been a direct and proximate cause of the physical abuse visited on Wilson. So judgment was entered in favor of all defendants, though meanwhile the Police Board of Chicago, in disciplinary proceedings against the officers, had found three of them guilty of

misconduct, suspended two of them, and fired the third—Burge. The decision of the Police Board is under appeal to a state court. The Fraternal Order of Police was unsuccessful in its effort to enter a float in the most recent St. Patrick's day parade honoring Burge and the other officers who were disciplined.

■ Wilson challenges a number of the district judge's rulings at the second trial, particularly those in which the judge allowed the defendants' counsel, over heated objections by the plaintiff's counsel, to immerse the jury in the sordid details of Wilson's crimes. The plaintiff argues that the probative value of this evidence was clearly outweighed by its prejudicial effect, so that its admission violated Rule 403 of the Federal Rules of Evidence. Although a district judge has broad discretion in ruling on the admissibility of evidence, especially when balancing intangibles as Rule 403 requires, we cannot avoid concluding that the limits of permissible judgment were exceeded. A mass of inflammatory evidence having little or no relevance to the issues in *this* trial (as distinct from Wilson's murder trial) was admitted, and the defendants' counsel was permitted to harp on it to the jury and thus turn the trial of the defendants into a trial of the plaintiff. Of course, when the plaintiff in a case happens to be a murderer this turning of the tables has undoubted forensic appeal. But even a murderer has a right to be free from torture and the correlative right to present his claim of torture to a jury that has not been whipped into a frenzy of hatred. At the argument of the appeal the lawyer for the officers—who had been the prosecutor at Wilson's criminal trials—acknowledged in answer to a question from the bench that he had tried to make the jury hate Wilson.

■ We are not suggesting that the murder convictions should have been concealed from the jury. Not even the plaintiff sought that, for his theory was that the defendants had tortured him *because* he was a cop killer and they had a policy of meting out physical abuse to such people. The fact that he had killed *two* policemen made it all the more plausible that he had been abused. And

when he took the stand he exposed himself to cross-examination designed to impeach his credibility by establishing that he was a convicted criminal. Fed.R.Evid. 609(a)(1). The fact that the conviction was under appeal did not make it inadmissible for this purpose although Wilson could have tried to draw the sting of impeachment by pointing out that the conviction was not yet final. Fed.R.Evid. 609(e). The cross-examiner should not however have been permitted to elicit the *details* of the crimes underlying Wilson's conviction unless the details bore directly on his credibility, *Gora v. Costa*, 971 F.2d 1325, 1330 (7th Cir.1992); *Geitz v. Lindsey*, 893 F.2d 148, 151 (7th Cir.1990); *Campbell · v. Greer*, 831 F.2d 700, 707 (7th Cir.1987), and they did not. (Wilson obviously had no need to bring out the details of his crimes in order to establish that he was within the scope of the city's alleged policy of physically abusing persons suspected of killing or injuring policemen.) Of course he could not be allowed to depreciate the gravity of his crimes, as by claiming that he didn't *really* murder the policemen—that, for example, he had been acting under extreme provocation. But he didn't try to do any such thing.

█ So neither Rule 609 nor Wilson's own testimony justified the defendants in introducing evidence of the ugly details of his crimes. The justification must be sought elsewhere. The defendants argue that the evidence was directly relevant to the question whether Wilson had in fact been tortured. A review of the evidence shows that it was not. Here are some of the details of the murder that were presented to the jury in testimony by the defendants and other defense witnesses: Wilson and his brother had stolen a gun in a home invasion; they had planned to use the gun to help another man, who had been arrested for the murder of a Chicago police officer, escape from jail; the officers whom Wilson had killed, Fahey and O'Brien, had multiple gunshot wounds and Fahey had been killed by a shot from his own service revolver fired into the base of his skull at close range; Wilson and his brother had stolen the dead officers' service revolvers and hidden them in a beauty shop along with a sawed-off shotgun used in the murder of still another officer; Wilson had laughed

about the murders. Asked on cross-examination about these things Wilson took the Fifth Amendment. Among defense exhibits admitted over his lawyer's objections were photographs of the murder scene, Officer Fahey's service revolver, Wilson's eyeglasses found at the murder scene, and a photograph of the beauty shop. Fahey's service revolver—which defense counsel waved about during his closing argument—was one of the exhibits that the jury had in the jury room during its deliberations. Wilson was forced to show the jury a tatoo on his arm, consisting of a rose, two shovels, and a noose. Defense counsel described to the jury Wilson's taking Fahey's .357 magnum revolver out of Fahey's holster, putting it to the back of Fahey's head, and killing him.

The defendants argue that all this evidence was relevant to showing that Wilson might have been injured not during the interrogation as he testified but in the scuffle with the officers whom he killed or while being arrested, or alternatively that he was so desperate that he might have inflicted the radiator burns on himself in order to fake a coerced confession. The judge apparently accepted the alternative ground. Neither ground was remotely plausible. None of the witnesses had testified that Wilson was injured in the decidedly one-sided scuffle with the police officers whom he killed. There was some evidence that he might have gotten a cut above the eye while being arrested, but that had nothing to do with the circumstances of the murders themselves. While it is true that having confessed to two murders he might try to fake coercion by a self-inflicted injury, the plausibility of this theory is almost completely unrelated to the particulars of the murders. It could we suppose be argued that the gorier the murders the more likely Wilson was to be sentenced to death and therefore the greater his incentive to fake coercion; but the argument would be too tenuous to warrant the admission of such a massive amount of highly inflammatory evidence. We cannot begin to fathom the relevance of the photo of the beauty shop, but even this trivial detail was calculated to distract the jury from the legal issue, which is what the police had done to Wilson, not

what Wilson had done to the police. As for the tattoo, the contention that a person who is willing to be "mutilated" in this fashion is more likely to inflict a radiator burn on himself stretches the concept of relevance beyond the breaking point. Would evidence that Wilson had a pierced ear have been admissible for this purpose?

While the judge was far too generous in allowing the defendants to present evidence, he was far too chary in allowing the plaintiff to present evidence. He kept out on grounds of relevance the plainly relevant testimony of Melvin Jones, who claimed to have been subjected to electroshock by Burge and other officers nine days before the interrogation of Wilson. If Burge had used an electroshock device on another suspect only a few days previously, this made it more likely (the operational meaning of "relevant") that he had used it on Wilson. Another excluded plaintiff's witness, Donald White, would have testified that he was arrested as a suspect in the murder of the two police officers shortly before Wilson's arrest and was taken to a police station where he was beaten for several hours by Burge and other defendant officers. Although evidence of prior bad acts is inadmissible to prove a propensity to commit such acts, it is admissible for other purposes, including intent, opportunity, preparation, and plan. Fed.R.Evid. 404(b). Jones's evidence would have served all four of these purposes, White's all but the third (preparation); and, since Burge had denied under cross-examination that he had ever had or used an electroshock instrument, Jones's evidence could also have been used to impeach that denial. The exclusion of these two witnesses' evidence incidentally doomed Wilson's case against Officer McKenna, and he was granted a directed verdict; if as we believe the exclusion of their evidence was error, so was the grant of the directed verdict.

The judge's errors cannot be considered harmless. The plaintiff's case was strong, as evidenced by the decisions of the Supreme Court of Illinois and the Police Board of Chicago. The torrent of inflammatory evidence and argument that the judge allowed the jury to consider may well have been decisive. Evidence that the jury was in fact confused is found in its verdict, which declared that Wilson's rights had been violated but not by any of the individual defendants or even by the city's policy (as the jury found it to be) of authorizing the abuse of suspected cop killers. By whom then?

Since there must be a new trial at which other issues presented by this appeal may recur, we shall indicate our view of them for the guidance of the district court. We do not think the judge abused his discretion in refusing to allow a Dr. Kirschner to testify that Wilson's description of the physical pain and emotional distress induced by the alleged electroshock treatment was consistent with the scientific understanding of the effects of electroshock and hence unlikely to have been fabricated. Dr. Kirschner is a pathologist who studies torture on the side. The judge was not satisfied that Kirschner had established his credentials as an expert in the physiology of torture—or even that there is such a field of expertise. (It appears that there is. See, e.g., Glenn R. Randall and Ellen L. Lutz, *Serving Survivors of Torture: A Practical Manual for Health Professionals and Other Service Providers* (1991).) We do not consider this ruling an abuse of discretion. The Federal Rules of Evidence have, it is true, liberalized the standards for qualifying expert witnesses. *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 169, 109 S.Ct. 439, 449–50, 102 L.Ed.2d 445 (1988). No longer need they belong to some recognized professional community. It is enough, to be qualified as an expert and thus entitled to give opinion testimony, that one has specialized knowledge that would assist the trier of fact. Fed.R.Evid. 702. But the consequence of this liberality is not, or at least should not be, a free-for-all. The elimination of formal barriers to expert testimony has merely shifted to the trial judge the responsibility for keeping "junk science" out of the courtroom. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, ——–——, 113 S.Ct. 2786, 2798–99, 125 L.Ed.2d 469 (1993). It is a responsibility to be taken seriously. If the judge is not persuaded that a so-called expert has genuine knowledge that can be

genuinely helpful to the jury, he should not let him testify.

Dr. Kirschner is a pathologist, which is to say an expert on postmortems, not a neurologist, psychiatrist, or physiologist. His study of torture is an avocation. It is a serious avocation. He claims to spend several hours every week studying torture and to have talked to a number of electroshock victims, and we have no reason to doubt these claims. But he failed to show that he has the requisite medical or scientific knowledge to establish the effects of electroshock treatments on the human body or psyche. All he was in a position to attest was that Wilson's description of the effects of electroshock was consistent with that given by other electroshock victims with whom Kirschner has talked—testimony that would not even draw on Kirschner's medical expertise. If there is an objective body of scientific evidence concerning the effects of electroshock, it is unlikely that its sole possessor is a professed amateur in the subject.

■ The judge excluded the testimony of a British journalist, Gregory Miskiw, that one of the defense witnesses, William Coleman, was a liar. Coleman had shared a cell with Wilson in 1987, before Wilson's second criminal trial, and he testified that Wilson had told him that at his trial he was going to fabricate a tale of having been coerced to confess, in order to beat a murder rap. An odd suggestion; at the time of the alleged conversation the Supreme Court of Illinois had already suppressed the confession as coerced. In any event the plaintiff wanted to impeach Coleman's credibility with testimony by Miskiw that Coleman had once fed him two pieces of juicy gossip, one concerning a cousin of the Queen of England, that had turned out to be false.

■ The rules of evidence permit (with various limitations) impeaching a witness by evidence that he has a reputation for untruthfulness or even—a novelty—by *opinion* evidence that he is untruthful. Fed. R.Evid. 608(a); Note to Rule 608(a) of Advisory Comm. on 1972 Proposed Rules. The fact that Coleman had lied to Miskiw about Queen Elizabeth's cousin would not fit the older or newer version of the rule. The telling of a lie not only cannot be equated to the possession of a *reputation* for untruthfulness, but does not by itself establish a *character* for untruthfulness, as the rule explicitly requires whether the form of the impeaching evidence is evidence of reputation or opinion evidence. Trials would be endless if a witness could be impeached by evidence that he had once told a lie or two. Which of us has never lied? Cf. David Nyberg, *The Varnished Truth: Truth Telling and Deceiving in Ordinary Life* (1993). But there is more here. Miskiw wanted to testify that Coleman had a reputation for untruthfulness among people who had worked with Coleman and members of his family, who regarded him as "the blackest of the black sheep of the family." Was this a "community" within the meaning of the rule? We suppose so. Coleman is a peripatetic felon. He is not a member of any stable community, but that is true of a lot of law-abiding people in our mobile society, and a community doesn't have to be stable in order to qualify under the rule. Cf. *McCormick on Evidence* § 43 at p. 159 (4th ed. 1992). It was Miskiw's job as a reporter to determine Coleman's reputation for trustworthiness in order to decide whether to place any credence in his gossip about the royal cousin. His interviews with members of Coleman's "community" enabled him to testify to Coleman's reputation in that community on the basis of personal knowledge.

Miskiw had also spent a fair amount of time with Coleman himself, in an effort to determine whether the gossip was accurate. On the basis of his personal contacts with Coleman he formed the apparently well-substantiated opinion that Coleman was "a consummate liar." This opinion was admissible wholly apart from evidence about Coleman's reputation in his own community.

■ In addition, the judge confined cross-examination of Coleman too tightly by preventing Wilson's counsel from establishing that at the time that, according to Coleman, Wilson had told him that he was going to fake coercion in order to get his confession suppressed, the confession had already been suppressed. Laying this fact before the jury

would have greatly undermined Coleman's credibility, and rightly so.

We need not discuss the other points raised by Wilson's appeal; they either are plainly without merit or will not recur at the next trial. (Also plainly without merit is the defendant officers' jurisdictional argument, foreclosed by *Chathas v. Smith,* 848 F.2d 93 (7th Cir.1988).) But we must consider the City of Chicago's argument that it was entitled to judgment because no reasonable jury could have found that the city had a policy of allowing police officers to torture persons suspected of killing or wounding officers. The city conceded, prematurely in light of *Auriemma v. Rice,* 957 F.2d 397 (7th Cir. 1992), that the Superintendent of Police, Richard Brzeczek, was responsible for formulating the city's policies with respect to the police force; he thus *was* the city for purposes of this case. Had he formulated, announced, approved, encouraged, acquiesced in, or otherwise adopted a policy of physical abuse of suspected cop killers? Brzeczek had received many complaints from members of the black community that officers in "Area 2 Violent Crimes," the police unit in which Wilson was tortured, were abusing suspects; such abuse was in fact common in Area 2. Brzeczek had referred the complaints to the office in the police department that is responsible for investigating complaints of police misconduct, but the office had done nothing except lose a lot of the complaints. Brzeczek had written the state's attorney that he would do nothing further unless the state's attorney assured him that doing something would not interfere with the prosecution of Wilson; the letter was not answered, so true to his word Brzeczek did nothing further. Brzeczek had downplayed the gravity of the problem in Area 2 in discussions with black police officers. He had even signed a commendation for Burge, though it had been prepared by others for his signature and he may not have noticed Burge's name.

A rational jury could have inferred from the frequency of the abuse, the number of officers involved in the torture of Wilson, and the number of complaints from the black community, that Brzeczek knew that officers in Area 2 were prone to beat up suspected cop killers. Even so, if he took steps to eliminate the practice, the fact that the steps were not effective would not establish that he had acquiesced in it and by doing so adopted it as a policy of the city. He referred the complaints to the unit within the police department that is responsible for investigating police abuses. It was the plaintiff's responsibility to show that in doing this Brzeczek was not acting in good faith to extirpate the practice. That was not shown. At worst, the evidence suggests that Brzeczek did not respond quickly or effectively, as he should have done; that he was careless, maybe even grossly so given the volume of complaints. More was needed to show that he *approved* the practice. Failing to eliminate a practice cannot be equated to approving it. Otherwise every inept police chief in the country would be deemed to approve, and therefore become answerable in damages to all the victims of, the misconduct of the officers under his command—indeed might (contrary to *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)) be deemed responsible for all the murders and robberies that he had through his carelessness failed to prevent.

Deliberate or reckless indifference to complaints must be proved in order to establish that an abusive practice has actually been condoned and therefore can be said to have been adopted by those responsible for making municipal policy. *Jones v. City of Chicago,* 856 F.2d 985, 992–93 (7th Cir.1988); *Gonzalez v. Ysleta Independent School District,* 996 F.2d 745 (5th Cir.1993); *Kopf v. Wing,* 942 F.2d 265, 269 (4th Cir.1991); *Harris v. City of Pagedale,* 821 F.2d 499, 504 (8th Cir.1987); *Fiacco v. City of Rensselaer,* 783 F.2d 319, 326, 328–32 (2d Cir.1986). If Brzeczek had thrown the complaints into his wastepaper basket or had told the office of investigations to pay no attention to them, an inference would arise that he wanted the practice of physically abusing cop killers to continue. There is no evidence in this case from which the requisite inference could be drawn by a rational jury.

Neither respondeat superior nor negligent supervision of subordinates is an authorized ground of liability in a suit under 42 U.S.C. § 1983. Wilson had to prove that Brzeczek had engaged in conduct fairly describable as personal deliberate wrongdoing. Proof of dereliction of duty was not enough. But that was all there was.

The judgment is affirmed with respect to the city (and other defendants sued in their official capacity), and also with respect to the dismissal of defendants Ferro and estate of Mulvaney for want of service (Wilson did not appeal their dismissal). But it is otherwise reversed, and the case is remanded to the district court for further proceedings conformable to this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

## ORDER

Dec. 8, 1993.

We have petitions for rehearing by plaintiff Wilson and one of the defendants, Officer McKenna. Wilson's petition has no merit and is denied. McKenna, however, points out an error in our opinion. We had thought that the district judge had granted McKenna's motion for a directed verdict at the close of the evidence in the second trial, by which time there was enough evidence of McKenna's participation in the alleged infringement of Wilson's constitutional rights to create a jury issue. In fact the motion for directed verdict was granted at the end of the first trial, at which time there was not enough evidence to create a jury issue concerning McKenna's liability. Therefore the motion was correctly granted, and we should not have reversed the grant. Our judgment is therefore modified to affirm the entry of judgment in McKenna's favor.