THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. DOUGLAS R. PONCAR, Defendant-Appellee.

Second District   No. 2—00—0311

Opinion filed July 30, 2001.

Joseph E. Birkett, State's Attorney, of Wheaton (Martin P. Moltz and Gregory L. Slovacek, both of State's Attorneys Appellate Prosecutor's Office, and Margaret M. Healy, Assistant State's Attorney, of counsel), for the People.

Donald J. Ramsell, of Ramsell & Armamentos, of Wheaton, for appellee.

JUSTICE O'MALLEY delivered the opinion of the court:

In a two-count indictment, the State charged defendant, Douglas R. Poncar, with aggravated driving under the influence of alcohol (ag-

gravated DUI) (625 ILCS 5/11—501(a)(1), (a)(2), (d)(1)(A) (West 1998)). The trial court granted defendant's motion to suppress the results of a blood test medical personnel administered at a hospital. On appeal, the State contends that the trial court erroneously concluded that suppressing the evidence was appropriate because defendant was injured while in custody. We reverse and remand.

The State indicted defendant on September 30, 1998. On June 1, 1999, defendant moved to quash his arrest and suppress evidence. The trial court denied the motion on August 2, 1999. Defendant then moved to suppress the results of the blood test.

During the suppression hearing on defendant's second motion, defendant presented the testimony of Officers James Sakelakos and William Rowley. Their testimony revealed the following, essentially undisputed facts. At 2:49 p.m. on July 30, 1998, Sakelakos observed defendant driving with a flat tire and stopped him. Because of the damage to the rim, it seemed that defendant had been driving with a flat tire for some time. Defendant appeared highly intoxicated, and Sakelakos attempted to administer field sobriety tests. Shortly thereafter, Sakelakos arrested defendant. Because defendant had soiled himself, Sakelakos called for a transport van and had defendant sit on the curb.

Defendant became unhappy when another officer who arrived at the scene began to search defendant's vehicle. Defendant attempted to stand up several times. When he finally managed to do so, he stumbled. Sakelakos extended his arms to prevent defendant from falling and again had him sit on the curb.

When the van arrived, defendant initially refused to enter it. Defendant then attempted twice to enter the van but missed the step. Rowley, the driver of the van, guided defendant's foot onto the step and assisted him inside. Defendant then sat on the bench in the van. Sakelakos followed the van to the police station.

According to Sakelakos, when the van arrived at the station, Rowley opened the door, and defendant was lying on the floor. Defendant did not respond when the officers asked him to exit the vehicle, so Rowley attempted to assist defendant out of the van. Defendant initially resisted and used vulgar language but eventually exited the van.

Defendant also resisted somewhat as the officers led him to the "shakedown" room to inventory his property. In the room, Rowley asked defendant to place his hands and head against the wall. When defendant did not comply, Rowley placed defendant's hands on the wall. Defendant repeatedly pulled his hands away from the wall and tried to turn to face Rowley. Each time, defendant appeared to be

more agitated and uncooperative. At one point, defendant turned abruptly. Because Rowley was concerned that defendant might become aggressive, he positioned defendant against the wall again and held his forearm across the middle of defendant's back. Rowley testified that he used only the force necessary to return defendant to the desired position against the wall and did not shove him. At least two other officers assisted Rowley. Sakelakos testified that, because he turned away momentarily to retrieve a pair of gloves, he did not see how the injury occurred. Rowley testified that defendant turned his head, and defendant's right ear was cut after it struck the wall and became pinched between the wall and his eyeglass frames. According to Sakelakos, defendant was not bleeding profusely, but enough to warrant medical attention beyond basic first aid. Accordingly, the officers called for an ambulance. Defendant did not request medical treatment.

Because defendant continued to be uncooperative, the officers struggled with defendant while waiting for the ambulance and wrestled him to the floor. Sakelakos rode in the ambulance with defendant and was with defendant while he received treatment in the emergency room. In the emergency room, Sakelakos handcuffed defendant's left wrist to the gurney. Defendant remained uncooperative and refused to answer the treating nurse's questions. The nurse explained to defendant that he appeared to be intoxicated and that it was necessary to determine what he had taken. Therefore, a blood test was necessary before an anesthetic could be administered. Defendant objected to having his blood drawn. He did not resist, however, when medical personnel ultimately drew his blood. Shortly thereafter, medical personnel administered novocaine to defendant and treated the injury. None of the police officers present requested the blood test. Upon his discharge from the hospital, defendant told the hospital staff that the police officers beat him.

Before granting defendant's motion, the court expressed concern that allowing the evidence to be admitted could lead to police misconduct:

> "Doesn't that cause you some concern that if you allow the results of the tests when taken for treatment for these injuries that were inflicted by police, whether intentional or unintentional, that that would then open the door for police to do that whatever they wanted and then come up with a scheme and say, I don't know what happened?
>
> He was combative and we had to bat him down and he got injured.
>
> How do you prevent that from becoming the norm, I guess my question is."

The court then formulated a "prophylactic rule" as follows:

"Isn't it easier to have a blanket ruling that says if a person is injured at the hands of police, intentionally or unintentionally, the result they get can't be used against them in a DUI?

That way the police—even if there was a thought they might want to do that, it doesn't benefit them to do it.

Isn't it more of a prophylactic type of protection rather to say in each case did they beat him up or not beat him up? See what I'm saying?

I have heard enough I think. I'm going to decide this case not on the issue of whether it's admissible on the statute but on the basis that something bothers me about the idea of a person being in custody for DUI and then receiving some type of physical injuries at the hands of the police.

I'm not saying these officers, that they intentionally beat this man up or did anything intentional to cause him harm.

But there's no question that whatever the harm was, the injury he suffered while at the hands of police, be it because he was an aggressor or wasn't an aggressor—I don't know what happened, and I don't have to decide that.

I think it's a better rule to say that if a person is injured, after already being arrested for DUI, he's injured at the hands of the police, and there is no question he was injured at the hands of the police.

They did something that caused the injury.

Again, it's not a matter of whether they did it intentionally or in terms of trying to protect themselves from some aggression.

If they do that, if it happens, they know they can't then take him to the hospital and get blood results and use that in a DUI.

That I think is a safety net for everyone involved.

That way the police would not be tempted to do that, and we don't have to make that decision.

So I'm going to base my decision in suppressing the blood results on the basis that in this particular factual situation where the person is already arrested for DUI, he suffers injuries while in custody at the hands of the police, then those blood results will not be admissible against him in the DUI case.

Now, that's basically these facts of this case.

I'm not going to say if someone is walking into the police station and he trips on his own and bangs his head, and they take him to the hospital, that might not be a different result.

But on these facts and these circumstances I'm going to grant the motion."

The State filed a certificate of impairment and timely appealed. See 145 Ill. 2d R. 604(a)(1). We review *de novo* the trial court's interpretation of the law.

•1 Only fourth amendment constraints and specific statutory provisions govern the admissibility of blood-alcohol tests in a DUI prosecution. *People v. Yant*, 210 Ill. App. 3d 961, 964 (1991).

Section 11—501.4 of the Illinois Vehicle Code (Code) provides:

"(a) Notwithstanding any other provision of law, the results of blood tests performed for the purpose of determining the content of alcohol *** of an individual's blood conducted upon persons receiving medical treatment in a hospital emergency room are admissible in evidence as a business record exception to the hearsay rule only in prosecutions for any violation of Section 11—501 of this Code *** when each of the following criteria are met:

(1) the chemical tests performed upon an individual's blood were ordered in the regular course of providing emergency medical treatment and not at the request of law enforcement authorities;

(2) the chemical tests *** were performed by the laboratory routinely used by the hospital; and

(3) results of chemical tests performed upon an individual's blood are admissible into evidence regardless of the time that the records were prepared.

(b) The confidentiality provisions of law pertaining to medical records and medical treatment shall not be applicable with regard to chemical tests performed upon an individual's blood under the provisions of this Section in prosecutions as specified in subsection (a) of this Section." 625 ILCS 5/11—501.4 (West 1998).

The testimony revealed that defendant's injury was serious enough to warrant medical attention and that medical personnel ordered the blood test in the regular course of providing emergency medical treatment. Thus, if the State lays the proper foundation regarding the manner in which medical personnel conducted the blood test, section 11—501.4(a) would allow the State to introduce the results of the test at trial.

The trial court essentially ruled that, even if section 11—501.4 applied, it is necessary to create an exception where the suspect receives emergency medical treatment after being injured while in police custody. The court expressed concern that admitting the blood test results under the circumstances of this case might provide police with an incentive to injure an uncooperative suspect so they could transport him to the hospital and obtain a blood test.

•2 The trial court's ruling was contrary to well-established law. Defendant cites no authority for the rule adopted by the trial court that the results of a blood test performed by emergency medical personnel for the treatment of injuries sustained by a person while he was in police custody are *per se* inadmissible under section 11—501.4.

No such rule is provided in the plain text of section 11—501.4. Defendant points to no case construing that text as embodying such a rule, nor can we find any such case. We disagree with defendant's suggestion that *People v. Wilson*, 116 Ill. 2d 29 (1987), stands for the rule that "evidence against a person should not be admitted when it is obtained through questionable circumstances relating to an injury to a defendant created at the hands of police officers." *Wilson* concerned the admissibility of a confession under section 114—11(d) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 114—11(d) (now 725 ILCS 5/114—11(d) (West 1998))), which requires that the State establish the voluntary nature of a defendant's confession. See *Wilson*, 116 Ill. 2d at 38. The court in *Wilson* made no suggestion that its holding was relevant to the admissibility of other types of evidence such as blood test results, and defendant points to no relevant analogy between *Wilson* and this case.

The results of defendant's blood test are not barred under the fourth amendment either. In *Yant*, the court held that the fourth amendment did not preclude admission of the defendant's blood test results because there was no indication that the physician's blood test order was a subterfuge procured by the police or a form of State action. *Yant*, 210 Ill. App. 3d at 965. As in *Yant*, there is no evidence here that supports a conclusion that the blood test was the result of police subterfuge. The only conclusions that reasonably may be drawn from the evidence are that defendant was combative during the entire time he was at the police station and that he was injured accidentally while resisting the officers' attempt to keep defendant in the desired position. The trial court declined to find that the officers "did anything intentional to cause [defendant] harm." Instead, the court declared that the fact that defendant was in police custody when he was injured was sufficient to render the blood test results inadmissible. This rule is contrary to the rule in *Yant* that the results of a blood test performed by emergency medical personnel are admissible under the fourth amendment unless the police employed subterfuge to procure the test. See *Yant*, 210 Ill. App. 3d at 965.

Accordingly, we reverse the judgment of the circuit court of Du Page County and remand the cause for further proceedings. We direct the trial court to determine, consistent with the rule in *Yant*, whether or not the police employed subterfuge to obtain a test of defendant's blood following his arrest.

Reversed and remanded with directions.

McLAREN and CALLUM, JJ., concur.